******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* NASIR R. HARGETT
## (AC 42405)

Lavine, Elgo and Moll, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. He claimed that the trial court violated his right to present a defense when it excluded certain evidence of an alleged statement made by a bystander and an autopsy toxicology report, violated his right to due process when it declined to give a jury instruction on self-defense, improperly admitted firearm related evidence including, inter alia, reports by a state firearms expert, R, and violated his right to a fair trial when it failed to grant his motions for sanctions, for a new trial or to dismiss the charges after the state's late disclosure of the firearms related evidence. He further claimed that he was denied the right to a fair trial due to prosecutorial impropriety. *Held*:

1. The trial court did not abuse its discretion or violate the defendant's right to present a defense by excluding evidence of a statement allegedly made by an unidentified bystander and the toxicology portion of the victim's autopsy report.

   a. The defendant failed to demonstrate the relevancy to his claim of self-defense or to lay an evidentiary foundation for the unidentified bystander's alleged statement; the defendant failed to lay the foundation necessary to admit the alleged statement as relevant to his state of mind, in that he failed to offer any testimony that the alleged statement influenced his assessment of the need to use deadly physical force against the victim and, as there was no evidence that the defendant heard the alleged statement, it was irrelevant to his motive.

   b. The trial court properly excluded the toxicology report from evidence: there was no causal relationship between the victim having PCP in his body and the defendant having shot him; moreover, at trial, the defendant failed to explain why the presence of PCP in the victim was relevant to his claim of self-defense or his intent and there was no evidence that the defendant feared the victim or that the victim threatened anyone and there was no evidence that the victim confronted the defendant with the imminent use of deadly force from which the jury could have inferred that the defendant acted in self-defense; furthermore, the state's evidence was sufficient to disprove self-defense beyond a reasonable doubt.

2. The trial court did not violate the defendant's right to due process by failing to give a self-defense jury instruction; no reasonable juror could have believed that the defendant was in imminent or immediate danger so as to warrant the use of deadly physical force, because there was no evidence that the defendant was afraid of the victim, there was no evidence of a conversation between the defendant and the victim before the victim left the defendant's porch and there was no evidence that, after the defendant followed the victim down the street, the victim moved toward the defendant, made a threatening gesture or made a verbal threat indicative of immediate or imminent harm.

3. The trial court did not abuse its discretion by failing to sanction the state for its late disclosure of the murder weapon and, thus, properly denied the defendant's motion for a new trial or to dismiss the charges on the basis of the state's late disclosure of the murder weapon and related materials: although the disclosure of the murder weapon was late, it did not constitute bad faith, and the firearms evidence, including R's reports, was disclosed during jury selection and before R testified; moreover, the state disclosed R's report to the defendant as soon as the state was aware of the report and made R available to the defendant before trial but the defendant elected not to examine them, and the defendant was able to address R's reports and changes to them when R testified; furthermore, the court was willing to grant the defendant a continuance and offered the defendant the option to continue plea negotiations before evidence began, but the defendant did not elect to do either; moreover, the defendant failed to explain how a firearms expert could have assisted

his theory of self-defense.

4. The defendant was not deprived of a fair trial by prosecutorial impropriety during closing arguments: although the prosecutor's statement that the defendant killed the victim "in cold blood" was improper, the defendant failed to object to the prosecutor's use of the phrase, defense counsel used the phrase himself, the prosecutor stated the phrase only once, the use of the phrase was not central to the case and the state's case against the defendant was strong; moreover, the prosecutor's argument that the case was a senseless American tragedy was not improper, as the statements were grounded in evidence and the jury reasonably could have concluded that the unexplained shooting death of the victim was a tragedy.

Argued September 10, 2019—officially released March 3, 2020

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield, where the court, *Pavia, J.*, denied the defendant's motion for sanctions; thereafter, the case was tried to the jury; subsequently, the court granted the state's motions to preclude certain evidence and denied the defendant's motion for sanctions; thereafter, the court denied the defendant's motion for judgment of acquittal and request for a jury instruction; verdict and judgment of guilty, and sentence enhanced for the use of a firearm in the commission of a felony, from which the defendant appealed. *Affirmed.*

*Ann M. Parrent*, assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *John C. Smirga*, state's attorney, and *Ann P. Lawlor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Nasir R. Hargett, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder. In addition, the jury also found, pursuant to an interrogatory, that "the defendant employed the use of a firearm in the commission of a felony," and the court accordingly enhanced his sentence. On appeal, the defendant claims that the trial court (1) violated his sixth amendment right to present a defense by excluding from evidence (a) a statement purportedly made by a bystander and (b) an autopsy toxicology report, (2) violated his right to due process by declining to give a jury instruction on self-defense, (3) abused its discretion by admitting firearm related evidence, and (4) violated his right to a fair trial by failing to grant his motion for a new trial or to dismiss the charges. The defendant also claims that he was denied the right to a fair trial due to prosecutorial impropriety that occurred during final argument. We affirm the judgment of the trial court.

The following procedural history and facts the jury reasonably may have found beyond a reasonable doubt are relevant to our resolution of the defendant's claims on appeal. On October 13, 2014, the defendant was an eighteen year old high school student living with his parents on East Main Street in Bridgeport. At approximately noon that day, Kaishon McAllister and his friends Romy and Kahdeem were talking with the defendant on the porch of the defendant's home when a man in a black coat, later identified as the victim, Davon Robertson, walked up. According to McAllister, the victim was acting "weird" and appeared to be "high." When the victim reached into his pocket, McAllister thought the victim was going to shoot up the porch, although McAllister did not see a weapon. McAllister was nervous and went inside the defendant's home with Romy and Kahdeem. The defendant remained on the porch. The victim approached the porch and snatched a bottle of soda that McAllister had set down there. The victim then left the area and walked toward Pearl Street.

After the victim moved on, McAllister exited the defendant's home, intending to walk to his own home on Pearl Street. Romy and Kahdeem were with him. The defendant, however, went into his home and retrieved a gun. McAllister described it as a big gun that was sawed off and could not be held in just one hand. The defendant caught up to McAllister, and the two followed the victim toward Pearl Street. McAllister stated to the defendant: "Whatever you do, don't do this . . . don't do this like your life is on the line." The victim turned on Pearl Street and walked toward Brooks Street. The defendant and McAllister continued to walk behind him. When the defendant was in front of McAllister's house, he called, "Yo" and the victim turned around. The defendant and the victim "locked eyes" and exchanged

words. The defendant then fired the gun at the victim; McAllister gave contradicting testimony as to whether the victim was facing or turned away from the defendant. The defendant fired three shots: the first shot missed, the second one hit the victim, and the third shot struck him while he was on the ground near the corner of Pearl and Brooks Streets. McAllister, Romy, and Kahdeem were in shock and ran into McAllister's home. The defendant ran from the scene. The victim was taken to Bridgeport Hospital where he was pronounced dead. No weapon—gun or knife—was found on his body.

Later that day, the police searched the crime scene and recovered two .22 caliber shell casings and a soda bottle. They also executed a search warrant on the defendant's home and seized a hacksaw and a file from his bedroom. The police also interviewed McAllister and recorded his statement. The defendant was arrested the following day and charged with murder. The state subsequently filed an amended information charging the defendant with murder and use of a firearm in the commission of a felony.

Susan Williams, assistant state medical examiner, performed an autopsy of the victim's body, which revealed gunshot wounds to the victim's chest and lower right leg. She removed a bullet from the victim's chest and a bullet fragment from his leg. Williams opined that the cause of death was gunshot wounds to the left chest[1] and right leg; the manner of death was homicide.

On February 21, 2017, the defendant filed a motion for a speedy trial, which was granted by the court; jury selection commenced on February 27, 2017. At the conclusion of evidence and following arguments of counsel, the court charged the jury on murder, the lesser included offense of manslaughter, and use of a firearm in the commission of a felony. After the jury found the defendant guilty of murder and that he employed a firearm in the commission of a felony, the court imposed a total effective sentence of forty-five years in the custody of the Commissioner of Correction. Additional facts will be set forth as needed.

I

On appeal, the defendant claims that the court violated his constitutional right to present a defense by excluding from evidence (a) a statement purportedly made by an unidentified woman who claimed that the victim had robbed her at knifepoint, and (b) the toxicology portion of the autopsy report (toxicology report). The defendant claims that the woman's statement and the toxicology report would have helped the jury determine, on the basis of "the imprecise account of one teenager,"[2] what was in the defendant's mind at the moment he fired a weapon that fatally wounded the

victim. The state contends that the unidentified woman's statement and the toxicology report are irrelevant to the determination of the defendant's intent. We agree with the state.

The defendant also claims on appeal that the court abused its discretion by excluding the unidentified woman's purported statement and thereby prevented him from presenting evidence that he shot the victim in self-defense. We decline to review this evidentiary claim, as the defendant never proffered the woman's purported statement to show its alleged effect on his state of mind; see Conn. Code Evid. § 8-3 (4); and thus the evidentiary claim was unpreserved for appellate review. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at trial." (Internal quotation marks omitted.) *State* v. *Miranda*, 327 Conn. 451, 464, 174 A.3d 770 (2018). "Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by . . . trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair to both the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Jones*, 115 Conn. App. 581, 601, 974 A.2d 72, cert. denied, 293 Conn. 916, 979 A.2d 492 (2009). Even if the defendant had preserved this claim, the evidence was inadmissible as we explain herein.

The following additional facts are relevant to our resolution of the defendant's claims. Prior to trial, the state filed three motions in limine to preclude the admission of certain evidence, including the unidentified woman's purported statement and the results of the toxicology report, indicating the presence of PCP[3] in the victim's body.

As to the woman's statement, McAllister told police that a woman on the street stated, after the victim had walked away from the porch but prior to the shooting, that the victim had robbed her at knifepoint. The state argued that the woman's statement should not be admitted into evidence because it was hearsay and did not fall within any recognized exception to the hearsay rule. Moreover, the state argued that the woman's statement was irrelevant, would confuse the jury, and was prejudicial evidence of the victim's character. Counsel for the defendant argued that the woman's statement was relevant to show the defendant's intent and that he feared that the victim was armed and dangerous. Counsel also argued that the statement was admissible under the excited utterance exception to the hearsay rule. The court deferred ruling until trial.

With respect to the toxicology report, the defendant claims that it was "unique scientific evidence that the substance influencing [the victim's] behavior may have

been PCP." The state argued that the victim's death was caused by multiple gunshot wounds and that the presence of PCP in his body was irrelevant as it did not tend to make the existence of any material fact more or less probable that the defendant caused the victim's death. The state further argued that, even if the toxicology report were relevant, it should be excluded pursuant to § 4-3 of the Connecticut Code of Evidence[4] because its admission would prejudice the state as inadmissible character evidence, as it could turn the focus of the trial to the victim's having ingested an illegal substance. Again the court deferred its ruling until trial.

We begin our analysis by setting forth the standard of review. "It is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion. . . .

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–62, 796 A.2d 1176 (2002).

"We first review the trial court's evidentiary rulings, if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail."

(Internal quotation marks omitted.) *State* v. *David N.J.*, 301 Conn. 122, 133, 19 A.3d 646 (2011).

## A

The defendant claims that the court denied him the right to present a defense when it sustained the state's objection to his cross-examination of McAllister regarding the unidentified woman's purported statement. We disagree.

Prior to the presentation of evidence, the court revisited the state's motions in limine in an effort to elicit more precisely the scope of the state's objection. The state argued that the statement was hearsay and irrelevant. The court stated that it would not prevent the defense from asking fact witnesses about their observations, but that counsel should address the basis of hearsay proffers and objections and speculation outside the presence of the jury.

During cross-examination of McAllister, defense counsel questioned him about an African-American woman who approached him, Romy, and Kahdeem as they left the porch of the defendant's home. Although the woman was yelling, McAllister did not think that she was excited. Defense counsel asked McAllister, "[I]f anything, what did the African-American woman tell you?" The state objected, and the court sustained the state's objection. Defense counsel argued that he was not offering the woman's statement for the truth of the matter asserted, but only to demonstrate that she made it. The court responded that "the fact that somebody said something certainly doesn't warrant an exception to the hearsay rule." Defense counsel did not ask that the jury be excused for further argument.[5] The question, therefore, is whether the court properly sustained the state's objection to the unidentified woman's statement on the grounds of relevancy and hearsay. See footnotes 4 and 6 of this opinion.

## 1

The defendant claims that the court abused its discretion by precluding him from placing the unidentified woman's purported statement into evidence on the ground of relevancy. We conclude that the court did not abuse its discretion.

As we previously noted, "evidence that is not relevant is inadmissible." *State* v. *Chiclana*, 149 Conn. App. 130, 144, 85 A.3d 1251, cert. denied, 311 Conn. 950, 90 A.3d 977 (2014). "To be admissible, [a] statement must . . . be relevant, both in the sense that it must relate to a material issue in the case and that it must have a logical tendency to aid the trier in the determination of a material issue." *State* v. *Esposito*, 223 Conn. 299, 315, 613 A.2d 242 (1992).

In the present case, the court found that the defendant had failed to demonstrate that the unidentified

woman's purported statement that the victim had just robbed her at knifepoint was relevant. The proffered statement is, in essence, in the nature of character evidence. In other words, the defendant sought to present evidence of the victim's alleged propensity for violence. Although a victim's character *ordinarily is irrelevant* evidence in a murder trial, "[i]t is well settled . . . that an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, *after laying a proper foundation by adducing evidence that he acted in self-defense* and that he was aware of the victim's violent character." (Emphasis added.) *State* v. *Miranda*, 176 Conn. 107, 109, 405 A.2d 622 (1978). Our Supreme Court has expanded the rule "to allow the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide." *State* v. *Smith*, 222 Conn. 1, 17, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). The expansion of the rule permitting character evidence to show that a victim was in fact the aggressor, irrespective of the defendant's state of mind, does not, however, obviate the need for the proponent of the evidence to lay an evidentiary foundation for a self-defense claim. See Conn. Code Evid. § 4-4 (a) (2)[6] (character evidence not admissible to prove conduct except under limited exceptions, including character of victim in homicide, "after laying a foundation that the accused acted in self-defense"); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2018) § 4.9.1, pp. 158–59 (if self-defense not an issue, evidence of alleged victim's character immaterial); E. Prescott, supra, § 8.8.2, p. 514 (underscoring principle that "[s]tatements admitted to show the effect on the hearer are not hearsay, but they should not be admitted unless the hearer's state of mind or subsequent conduct is relevant").

Here, the defendant contends that (1) the unidentified woman's statement was admissible nonhearsay because "[t]he fact that the woman said [the victim] robbed her, regardless of whether it was true, was relevant to motive and specific intent and to complete the story of the charged crime by placing it in the context of nearby and nearly contemporaneous happenings" (emphasis omitted; internal quotation marks omitted), citing, among others, *State* v. *Taylor G.*, 315 Conn. 734, 771, 110 A.3d 338 (2015), (2) "[t]he woman's statement tended to support an inference that [the defendant] believed [the victim] was armed, dangerous, and had just committed a violent crime," (3) the evidence was relevant to self-defense, and (4) the statement was also admissible for its truth under the spontaneous utterance exception to the hearsay rule. We disagree.

The defendant's reliance on *State* v. *Taylor G.*, supra, 315 Conn. 771, and *State* v. *Ali*, 233 Conn. 403, 427, 660

A.2d 337 (1995), is misplaced. Both cases address the admissibility of evidence of the defendant's prior misconduct, not the victim's. Those cases hold that a proponent who claims that the evidence will "complete the story" of the charged crime must establish the relevancy of such evidence. *State* v. *Taylor G.*, supra, 771; *State* v. *Ali*, supra, 427. The cases, therefore, are inapposite to the present case.

Moreover, even if the defendant had heard and believed the unidentified woman that the victim was armed, dangerous, and had just committed a violent crime, the defendant's failure to (1) claim and (2) lay an evidentiary foundation to demonstrate that he acted in self-defense makes that belief—and the statement itself—irrelevant. See *State* v. *Miranda*, supra, 176 Conn. 109. The record indicates that the defendant failed to satisfy two requirements for placing the purported statement in evidence: (1) laying a foundation that he acted in self-defense; and (2) offering the statement as relevant to his claim of self-defense. Rather, the defendant merely attempted to introduce the evidence as a nonhearsay statement without first having established the threshold requirements of relevancy.[7]

The evidentiary procedure for introducing character evidence for either a victim or a defendant to demonstrate he or she was the aggressor is the same. Our Supreme Court has instructed that evidence of a murder victim's violent character is inadmissible to show the defendant's state of mind unless two threshold requirements are met: (1) the defendant has laid a proper foundation "by adducing evidence that he acted in self-defense"; and (2) the defendant has laid a proper foundation by "adducing evidence that he . . . was aware of the victim's violent character."[8] Id. Otherwise, the proffered evidence is irrelevant. In the present case, the defendant never established an evidentiary foundation for his self-defense claim. The court, therefore, did not abuse its discretion by precluding the unidentified woman's purported statement as irrelevant.

2

The defendant also claims that the court abused its discretion by precluding the unidentified woman's statement to demonstrate his state of mind. We disagree.

In the present case, the defendant failed to lay the foundation necessary to admit the woman's statement. The defendant presented no evidence that he knew the victim or knew of his violent propensities, if any. The defendant's claim that the woman's statement was relevant to determine his state of mind at the time he fired the gun at the victim falls short for a number of reasons. First, McAllister told the police that he heard the woman's statement after the victim had left the area in front of the defendant's porch, not before the defendant

retrieved his gun. Second, although McAllister heard the woman's statement, the defendant presented no evidence that he himself heard it.[9] More to the point, without evidence that the defendant heard the statement, the statement is irrelevant to his motive. Proffered evidence of this nature is irrelevant to a defendant's state of mind at the time of a shooting when the defendant has failed to offer any testimony that the evidence influenced his assessment of the need to use deadly physical force against the victim. See *State* v. *Harrison*, 32 Conn. App. 687, 702, 631 A.2d 324, cert. denied, 227 Conn. 932, 632 A.2d 708 (1993). The court, therefore, did not abuse its discretion by sustaining the state's objection to McAllister's testifying about the woman's statement.[10]

B

The defendant claims that the court violated his right to present a defense by excluding from evidence the toxicology report, which revealed the presence of PCP in the victim's body at the time of death. We do not agree.

The following facts are relevant to our analysis of this claim. At trial, Williams testified about the autopsy she performed on the victim's body. As part of the autopsy procedure, Williams collected fluid specimens from the body and sent them to an independent laboratory for evaluation. The independent laboratory, "NMS Labs," provided the Office of the Chief Medical Examiner with a report of its analysis. The defendant sought to have the toxicology report admitted into evidence as a business record of the medical examiner's office. The state objected and conducted the following voir dire of Williams.

"[The Prosecutor]: Now, with respect to the findings that you discussed in your—from your autopsy with—with respect to the cause and manner of death, did the NMS lab report have any—any impact on your conclusions with respect to the cause and manner of the death of [the victim]?

"[Williams]: It did not.

"[The Prosecutor]: So this postmortem toxicology is done but yet it would not impact—it did not impact your findings in any way of the autopsy report that you did—the six page autopsy report that you drafted following your autopsy?

"[Williams]: That is correct.

"[The Prosecutor]: And would it be fair to say that your conclusions with respect to the manner and cause of death were made prior to even getting back the toxicology from the NMS Lab?

"[Williams]: That is true."

The state argued that the toxicology report was not

relevant because it had no impact on the conclusions Williams drew with respect to the manner and cause of the victim's death. Furthermore, the toxicology report contained commentary about the effects a certain drug may have on a person. The defense did not disclose an expert to testify or to explain how people behave or act under the influence of PCP or how the victim acted or could have acted under the influence of PCP. Moreover, the state argued that the report was prejudicial evidence of the victim's character regarding a drug that he ingested prior to his death and was not relevant.

The court questioned Williams as to whether the toxicology report had any bearing on her conclusion "in terms of this particular instance being a homicide." Williams stated that it did not. Thereafter, the court ruled that because the toxicology report had no bearing on Williams' conclusion, it was not "necessarily relevant." The court agreed with the state with respect to the extrinsic drug information contained in the toxicology report.

The defendant asked the court to reconsider its ruling, contending that the toxicology report was relevant because the victim appeared to McAllister to have "crazy eyes" and was intoxicated or was on crack or high at the time of the crime. In other words, the report was relevant to the victim's condition at that time and the jury should be permitted to review the report and make its own determinations. The court declined to alter its ruling, noting that the extraneous evidence in the toxicology report and the fact that the victim may have been high had no bearing on Williams' conclusion that this case was a homicide and, therefore, the toxicology report was irrelevant. Thereafter, in response to voir dire by defense counsel, Williams testified that she was unable to say how the victim was acting prior to his death on the basis of the PCP numbers in the toxicology report. In fact, she did not consider the toxicology report because the obvious cause of the victim's death was gunshot wounds to the victim's chest and leg, which caused him to bleed out.

In ruling, the court cited *State* v. *Wilson-Bey*, 21 Conn. App. 162, 168, 572 A.2d 372, cert. denied, 215 Conn. 806, 576 A.2d 537 (1990), noting that a toxicology report may be admitted when it is relevant for purposes of medical diagnosis and treatment.[11] Williams testified that she did not consider the toxicology report as it was not relevant to her determination of the cause or manner of the victim's death.

On appeal, the defendant argues that *Wilson-Bey* is inconsistent with *State* v. *Fritz*, 204 Conn. 156, 168, 527 A.2d 1157 (1987). We disagree with the defendant as the facts are distinguishable. In *Fritz*, portions of the decedent's autopsy report were placed into evidence to demonstrate the amount of Demerol that was in her body at the time of a fatal, one car automobile crash.

Id., 167. The amount of Demerol found in the decedent's body was ten times the normal therapeutic level. Id., 159. The evidence was relevant to demonstrate that the defendant physician had illegally prescribed medications. Id., 158. Our Supreme Court agreed with the trial court that the results of the decedent's autopsy were relevant to the charges against the defendant physician who prescribed the medication. Id., 169.

There is no similar causal relationship between the evidence of PCP in the victim's body and the defendant's having shot him. The defendant argues on appeal that "the toxicology report tended to support the . . . contention that [the victim] was under the influence of PCP, which was relevant to both self-defense and specific intent. It did not need to be relevant to the cause of death." At trial, the defendant failed to explain why the presence of PCP in the victim's body was relevant to self-defense and his intent or otherwise lay a foundation for the admission of the toxicology report.

On appeal, the defendant argues that the evidence of the PCP in the victim's body would support the existence and reasonableness of the defendant's fear of him. Although McAllister testified that the victim was acting "weird" and appeared to be high when he approached the defendant's porch, which caused McAllister to be nervous, there is no evidence that the defendant feared the victim. In fact, he remained on the porch until the victim moved on down the street. The victim did not say anything to anyone and did not touch anyone. There is no evidence that the victim threatened anyone. Although the defendant was not threatened or harmed by the victim, who "acted weird" in front of his porch, after the victim moved on, the defendant went into his home, got a gun, followed the victim down the street, and shot him. There is no evidence that the victim confronted the defendant with the imminent use of deadly force from which the jury reasonably could infer that the defendant acted in self-defense. The state's evidence was sufficient to disprove self-defense beyond a reasonable doubt. See *State* v. *Pauling*, 102 Conn. App. 556, 571–72, 925 A.2d 1200 (state's burden to disprove self-defense), cert. denied, 284 Conn. 924, 933 A.2d 727 (2007). The court, therefore, properly excluded the toxicology report from evidence.

For the foregoing reasons,[12] we conclude that the court did not abuse its discretion with respect to its evidentiary rulings and, therefore, did not violate the defendant's constitutional right to present a defense.

## II

The defendant claims that the trial court violated his right to due process by refusing to give the jury an instruction on self-defense. We disagree.

Following the close of evidence, the court e-mailed its proposed jury charge to counsel and requested that

they respond by return e-mail. In his response, counsel for the defendant requested that the court instruct the jury on self-defense. Thereafter, the court held an on the record charge conference during which defense counsel argued that a self-defense charge was warranted on the basis of McAllister's testimony that the victim and the defendant "locked eyes" and appeared to have an exchange of words before the defendant shot the victim. The prosecutor disagreed, stating that there was no evidence to warrant such an instruction and that "locking eyes, acting weird, going in a pocket, maybe being high, all things that simply without more do not constitute the need for a self-defense request." The court ruled that it would not instruct on self-defense because the facts presented to the jury would not support a self-defense charge.[13]

"[T]he fair opportunity to establish a defense is a fundamental element of due process of law . . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . Thus, [i]f the defendant asserts [self-defense] and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to [an] . . . instruction [on self-defense]. . . . Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. . . . To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . . This burden is slight, however, and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Best*, 168 Conn. App. 675, 686, 146 A.3d 1020 (2016).

To raise a claim of self-defense sufficiently to warrant an instruction, "a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be imminent or immediate. . . . Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that his attacker is using or about to use deadly force against him and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . . Moreover, the evidence must be such that the jury must not have to resort to speculation in order to find that the defendant acted in justifiable

self-defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 811, 717 A.2d 1140 (1998). "In determining whether the defendant is entitled to an instruction on self-defense . . . we must view the evidence most favorably to giving such an instruction." Id., 812.

Viewed in the light most favorable to the defendant, the record discloses that McAllister was nervous and fearful of the victim when he appeared in front of the defendant's porch. He, therefore, retreated into the defendant's house with Romy and Kahdeem. There was no evidence that the defendant himself was fearful of the victim. The defendant remained on his porch even though, as McAllister testified, the victim appeared to be high, was acting weirdly, and put his hand in his pocket. In essence, the defendant is asking us to attribute McAllister's fear of the victim to him. This we decline to do. Moreover, after the victim took McAllister's soda from the porch, he walked away without threatening or harming the defendant. There is no evidence of any conversation between the two of them at that time.

After the victim left the vicinity of the defendant's porch, McAllister exited the defendant's home intending to go to his own home on Pearl Street. Although the victim was gone, the defendant went into his home and returned with a gun. He caught up with McAllister and the others, as they all walked behind the victim as he traveled from East Main Street onto Pearl Street. The defendant called, "Yo" to the victim, who turned and "locked eyes" with him. There was an exchange of words, but what was said is not known. There was no evidence that the victim moved toward the defendant, made a threatening gesture, or voiced a verbal threat indicative of immediate or imminent harm. The defendant fired three shots at the victim.[14] The trial court concluded that locking eyes and exchanging words were not sufficient to warrant a charge on self-defense. On the basis of our review of the evidence, we agree with the court, concluding that no reasonable juror would find that the defendant believed that he was in imminent or immediate danger so as to warrant the use of deadly force. Although the bar for giving such an instruction is admittedly very low, given the facts of this case, we conclude that the court did not violate the defendant's right to due process by failing to give a self-defense instruction.

### III

The defendant claims that the court improperly refused to sanction the state for its late disclosure of the murder weapon and related materials, namely, the hacksaw and the file, and thereby denied him the right to due process. He therefore claims that he is entitled to a new trial or to have the charges against him dismissed. We disagree.

The following facts are relevant to the defendant's claim. A public defender was appointed to represent the defendant when he was arraigned on October 14, 2014. On March 11, 2015, the defendant asked the state to disclose any tangible objects, documents, and reports or statements of experts, including the results of physical examinations or scientific tests that it intended to offer into evidence during its case-in-chief or that were material to the defendant's case. The case was placed on the trial list on September 29, 2015. New counsel appeared for the defendant on October 24, 2016, and filed a motion for a speedy trial on February 21, 2017. The speedy trial motion was granted, and jury selection commenced on February 27, 2017. Jurors were informed that evidence would begin on March 20, 2017, and conclude by the end of March.

On March 7, 2017, the state disclosed that it intended to offer the murder weapon (gun) into evidence. The gun had been seized by the Bridgeport police in connection with a robbery that occurred on December 12, 2014.[15] The state also supplemented its disclosure with a report concerning the firearms evidence that was dated December 15, 2014, which had been prepared by Marshall Robinson, a firearms expert. Robinson's report stated that the shell casings recovered from the crime scene and the bullet and fragment recovered from the victim's body had been fired in the gun used by the defendant. On March 9, 2017, the state further supplemented its disclosure by producing a report authored by Robinson dated October 20, 2014.[16]

On March 13, 2017, the defendant filed a motion for sanctions, contending that he was prejudiced by the state's late disclosure in that he did not have enough time to prepare his defense before the presentation of evidence commenced. He argued that a continuance was an improper remedy because a continuance would violate his right to a speedy trial and force him to choose between his constitutional rights to due process and to a speedy trial. He asked the court to dismiss the charges against him or to prohibit the state from putting the gun and related evidence before the jury.

The court heard argument on the motion for sanctions on March 17, 2017. Defense counsel represented that the robbery defendant was prosecuted by the same office of the state's attorney prosecuting the defendant. The robbery defendant pleaded guilty and was sentenced in September, 2015, and the gun was then available for inspection in the present case. See footnote 15 of this opinion. The defendant contended that the late disclosure constituted a surprise, as he previously had been advised that the state did not have the murder weapon or ballistics tests, and that there was no causal connection between the .22 caliber bullets found during the autopsy and the nine millimeter shell casings recovered at the scene. He claimed that, as a result of the

late disclosure, the case against him was different from the one for which he had prepared. Moreover, during pretrial negotiations, he did not have the benefit of knowing all of the evidence against him.[17]

The prosecutor argued that the late disclosure was not the result of bad faith. Robinson's report was not in the state's file and that, as soon as the prosecutor became aware of it, she disclosed it to the defendant and made Robinson available to him. The defendant did not take advantage of speaking with Robinson. In addition, the state was at a similar disadvantage because it too had just learned that the gun was available.

The court ruled that, although the state's disclosure of the gun was late and not the best practice, it did not constitute bad faith.[18] With respect to Robinson's reports, the court found that the disclosure was not late and that the defendant could address the changes Robinson made in them when he testified. In addition, the court found that Robinson and the firearms evidence had been available to the defendant for at least nine days, but that he had elected not to examine them. Nonetheless, the court stated that it was willing to grant the defendant a continuance to have an expert examine the gun. The court also found that the defendant's defense was not prejudiced by the late disclosure. The court declined to issue a blanket ruling excluding the firearms evidence on the basis of late disclosure, but it stated that it would permit the defendant to raise specific objections during trial. The court, however, recognized that the late disclosure of the gun had prejudiced the defendant with respect to plea negotiations and offered him the option to continue plea negotiations before evidence began.

At trial, Robinson testified that the .22 caliber shell casings that the police found at the scene were fired in the Marlin .22 caliber sawed-off shotgun that the state put into evidence. He also testified that the tool marks on the barrel of the gun could have been made by the file found in the defendant's bedroom or "another one like it." The state proffered the hacksaw and file that the police found in the defendant's bedroom into evidence. The defendant objected, arguing that the tools had no probative value because it was speculative whether they were used to alter the gun.[19] The court overruled the defendant's objection, stating that the tools were relevant because Robinson testified that the murder weapon was a sawed-off gun. Following the verdict, the defendant filed a motion for a new trial on the ground that the state's late disclosure and the court's failure to exclude the gun and tools from evidence denied him due process, but declined the court's offer to request additional time to look at the matter. The court denied the motion.[20]

On appeal, the defendant raises numerous arguments,

claiming that the court's denial of his motion for sanctions and his motion for a new trial rested on legal error and clearly erroneous factual findings resulting in abuse of discretion because the court's decision was predicated on improper and irrelevant factors. More specifically, he argues that two of the court's factual findings are clearly erroneous, namely, (1) the defendant declined to have his own expert examine the evidence for tactical reasons,[21] and (2) there is no factual basis for the court to have rejected counsel's representation that the "defense does not have adequate time to properly prepare his defense for the March 20, 2017 trial date." (Internal quotation marks omitted.) With respect to his tactical decision not to retain an expert, the defendant argues that he did not seek a continuance because it would have compromised his right to a speedy trial. As to the adequacy of time to retain an expert, the defendant contends that the court merely assumed that there was adequate time to address the late disclosure without ascertaining whether the defendant could retain an expert in the required time, develop a legal strategy to address the validity of Robinson's conclusions, and reformulate a theory of defense.[22]

The defendant also contends that the court's decision not to impose sanctions was predicated on "irrelevant and improper factors," citing *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). He claims that the court determined that there was no bad faith on the part of the state without ascertaining why the office of the state's attorney does not employ procedures to ensure timely discovery disclosure. In addition, the court failed to consider relevant circumstances when it assumed that the defendant could obtain an expert witness within the time frame of trial. For example, he posits that, at the time of the state's supplemental disclosure, the public defender's office no longer was available to provide financial support for an expert because the defendant had secured private counsel. The court also did not consider the effect a continuance might have on the members of the jury who were told the trial would be over by the end of March.

In response, the state acknowledges that it should have taken steps to learn of the gun and disclose it to the defendant in a more timely manner. We agree that the state should have disclosed the gun timelier, but we also agree with the state that the court reasonably exercised its discretion by denying the defendant's request for sanctions because the firearms evidence was disclosed during jury selection and before Robinson testified. The state, therefore, argues that the defendant was not prejudiced.

We first set forth the relevant law and standard of review. "Practice Book § 40-5 gives broad discretion to the trial judge to fashion an appropriate remedy for

noncompliance with discovery. . . . Generally, [t]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As [our Supreme Court has] indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. . . . Suppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly." (Citations omitted; internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

"The purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial. To achieve these goals and to assure compliance with the rules, the trial court must impose an appropriate sanction for failure to comply. In determining what sanction is appropriate, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *State* v. *Festo*, 181 Conn. 254, 265, 435 A.2d 38 (1980).

In the present case, the court found that the state's late disclosure was not the result of bad faith but the failure of the police department's records to be placed in the defendant's criminal file in the office of the state's attorney. The defendant points to no evidence in the record indicating bad faith on the part of the state and, significantly, the defendant failed to take up the court's offer to continue the case. As soon as the prosecutor found the records and learned of the gun, she disclosed them to the defendant. The state made Robinson available to the defense, as the court ordered it to do. The court also gave the defense a reasonable opportunity to meet with Robinson, but defense counsel declined to do so.[23] The defendant also declined to consult with his own expert. Most importantly, the court offered the defendant the opportunity to return to plea negotiations. The defendant declined to do so. As to the inconsistencies in Robinson's reports regarding the size of the shell casings, the defendant was given a full opportunity to cross-examine him at trial. It was for the jury to determine the facts.

Despite the defendant's constitutional claim, he has failed to persuade us that he was meaningfully prejudiced by the late disclosure of the gun given the facts of the case against him. The defendant's theory of

defense was that he shot the victim in self-defense. He failed to explain how an expert's examination of the gun might have affected that defense. The question for the jury to decide was the defendant's state of mind when he shot the gun at the victim. The state presented a strong case with eyewitness testimony that the defendant shot the victim and that the victim died as a result of having been shot. We conclude, therefore, that the court did not abuse its discretion by failing to sanction the state for its late disclosure of the gun and, therefore, did not deprive the defendant of due process or a fair trial.[24] The court, therefore, properly denied the defendant's motion for a new trial or to dismiss the charges.

IV

The defendant's final claim is that he is entitled to a new trial on the basis of prosecutorial impropriety committed during closing argument that violated his right to due process. We agree, as the state concedes, that one of the prosecutor's statements was improper but conclude that the cumulative effect of the prosecutor's closing argument did not deprive the defendant of a fair trial and that a new trial is not warranted.

The defendant claims that the prosecutor was guilty of impropriety when she (1) argued the "defendant murdered [the victim] in cold blood," (2) argued "[w]e can't make sense out of a senseless act of murder, but what we can do is hold people accountable," (3) repeatedly asked the jury to hold the defendant "accountable for this senseless murder," (4) labeled the case an "American tragedy" and asked the jury to consider that this "senseless loss of life" should not occur in Bridgeport or surrounding towns, and (5) argued facts not in evidence. Despite raising numerous claims of prosecutorial impropriety on appeal, he objected only to the prosecutor's argument of facts not in evidence at trial.

We review "claims of prosecutorial impropriety under a two step analytical process. We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Elmer G.*, 176 Conn. App. 343, 363, 170 A.3d 749 (2017), aff'd, 333 Conn. 176, 214 A.3d 852 (2019). "Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"[I]n analyzing [harm], we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not, however, focus only on the conduct of the state's attorney. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of crimi-

nal defendants alleging prosecutorial [impropriety]. . . .

"To determine whether . . . [an] impropriety deprived the defendant of a fair trial, we must examine it under each of the *Williams* factors.[25] . . . Specifically, we must determine whether (1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of physical evidence." (Citations omitted; footnote added; internal quotation marks omitted.) Id., 50–51.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Elias V.*, 168 Conn. App. 321, 347, 147 A.3d 1102, cert. denied, 323 Conn. 938, 151 A.3d 386 (2016).

"[T]he prosecutor, as a public official seeking impartial justice on behalf of the people of this state, has a heightened duty to avoid argument . . . that strays from the evidence or diverts the jury's attention from the facts of the case. . . . Nonethless, [our Supreme Court has] recognized that the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Albino*, 312 Conn. 763, 772, 97 A.3d 478 (2014). We now address the defendant's claims of prosecutorial impropriety.

A

Prosecutorial Impropriety

1

The prosecutor commenced her final argument as follows: "You cannot make sense out of senseless violence and that's what this case is about. You simply cannot make sense out of senseless violence. [The victim] was a twenty-four year old man who was walking down a Bridgeport street in the early afternoon of October 13, 2014, when he was senselessly and fatally wounded by gunshots in the area of Pearl and Brooks Streets. The facts during this trial have shown that the defendant *murdered* [*the victim*] *in cold blood* and left him to bleed out in the middle of the street." (Emphasis added.) The defendant claims that the words "murdered

the victim in cold blood" were improper because the court gave a lesser included offense charge of manslaughter at the state's request.

In a divided opinion by our Supreme Court in *State v. Albino*, supra, 312 Conn. 774, the majority concluded that the prosecutor's "gratuitous comments about the defendant 'executing' [the victim] and committing 'murder in cold blood' were improper, considering that the defendant's evidence was deemed sufficient to warrant jury instructions on lesser included offenses inconsistent with a wholly unprovoked act of brutality that has been deemed by courts to justify the use of such terms." In the present case, at the state's request, the court gave a lesser included instruction, thus bringing the *Albino* rule into play. On appeal, the state, therefore, concedes that the prosecutor's "in cold blood" statement was improper. Notwithstanding the apparently brutal and unprovoked nature of the murder in this case, *Albino* compels us to conclude that the prosecutor committed an impropriety by arguing that the defendant murdered the victim in cold blood.[26] The jury reasonably could have inferred that the defendant's shooting the victim "was a wholly unprovoked act of brutality"; *State v. Albino*, supra, 774; even though the jury had the option of finding that the defendant did not have the intent to murder the victim.

2

The defendant also claims that the following portions of the prosecutor's final argument were improper. The prosecutor argued "[w]e can't make sense out of a senseless act of murder, but what we can do is hold people accountable," and repeated the words "accountable" and "this senseless murder" elsewhere in her argument. The prosecutor labeled the case an "American tragedy" and stated that the senseless loss of life should not occur in Bridgeport or surrounding towns. The defendant claims that the prosecutor's argument drew the jury's attention from a dispassionate examination of the evidence of specific intent. We disagree that the prosecutor's argument was improper.

When reviewing claims of prosecutorial impropriety, we are mindful "of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate . . . . By reason of his [or her] office, [the [prosecutor] usually exercises great influence [on] jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. . . . That is not to say, however, that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetori-

cal devices is simply fair argument. . . . Indeed, this court give[s] the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in a rhetorical straitjacket of always using the passive voice, or continually emphasizing that [she] is simply saying I submit to you that this is what the evidence shows, or the like. . . .

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 174–76, 133 A.3d 921 (2016).

Moreover, "[a] prosecutor is not precluded from using descriptive language that portrays the nature and enormity of the crime when supported by the evidence. Thus, to the extent the prosecutor's language appealed to the jurors' emotions, it did so because of the nature of the crime and not because of the terminology the prosecutor used to get [her] point across." *State* v. *Andrews*, 313 Conn. 266, 301, 96 A.3d 1199 (2014).

Given the evidence and the standard by which we assess the final arguments of a prosecutor, we conclude that the prosecutor's argument was not improper when she labeled the case a senseless American tragedy. Any jury reasonably could conclude that the shooting death of a twenty-four year old man by a teenager, for no discernible reason, is a tragedy for the victim and the defendant, as well as their families and friends. The fact that the shooting occurred at midday on a street corner in the greater community from which the jury was selected was tragic, as well. The victim's death certainly was senseless as the reason the defendant shot him is unexplained. The complained of portion of the prosecutor's argument was grounded in the evidence and, therefore, not improper.

B

*Williams* Analysis

We focus on whether the prosecutor's argument that

the defendant committed murder in cold blood violated the defendant's right to a fair trial. We conclude that the prosecutor's comment did not violate the defendant's right to a fair trial.

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . [6] and the strength of the state's case. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Papantoniou*, 185 Conn. App. 93, 110–11, 196 A.3d 839, cert. denied, 330 Conn. 948, 196 A.3d 326 (2018).

It is significant that, not only did the defendant fail to object to the prosecutor's use of the phrase "in cold blood," but also in his closing argument, defense counsel stated: "So what intent, what—what reason does someone who just wakes up at 11:30 in the morning have to go out and . . . kill someone in cold blood in the middle of the street?" Defense counsel could not have perceived the prosecutor's use of the phrase "in cold blood" to be prejudicial to the defendant or severe, if he himself used it in his final argument. The defendant did not ask the court to take any curative measures in light of the prosecutor's use of the phrase, "in cold blood." In its general instructions, the court stated, in part, that the arguments of counsel are not evidence and that the jurors must base their verdict on the evidence.

The prosecutor's use of the phrase "in cold blood" was not invited by the defense, and she stated it only once. The prosecutor's use of the phrase was not central to the case. The defendant's intent when he shot the victim was central to the case. Finally, the state's case against the defendant was strong. McAllister was an eyewitness to the shooting and testified that the defendant shot at the victim three times. We conclude, therefore, that the defendant was not deprived of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

¹ Williams' report, which was placed into evidence, stated that the victim

suffered a penetrating gunshot wound of the chest. The bullet entered "the left side of the [victim's] chest, [seventeen inches] below the top of the head and [six inches] to the left of midline . . . . The wound path extends rightward, backward and slightly downward through the skin, soft tissue and muscle of the left chest, passing into the chest cavity below the [fourth] left rib, passing through both lobes of the left lung, including passage through the hilar area, and into the lateral [eighth] thoracic vertebral body."

Williams testified, "So one bullet entered into the front of the body through the left upper chest."

[2] McAllister was the only eyewitness who testified to the shooting. The jury, however, was able to view surveillance videos that depicted the defendant walking behind the victim toward the crime scene and running from it. McAllister testified that he did not remember everything that he had seen more than two years earlier. Our review of the transcript discloses that McAllister's testimony was at times inconsistent, but appellate courts do not find facts. See *State* v. *Copeland*, 205 Conn. 201, 208 n.3, 530 A.2d 603 (1987). It is the function of the jury to examine the evidence and to make factual and credibility determinations. See *State* v. *Livingston*, 22 Conn. App. 216, 228, 577 A.2d 734, cert. denied, 216 Conn. 812, 580 A.2d 63 (1990).

[3] Phencyclidine, an hallucinogen, is commonly referred to as PCP. *State* v. *Benefield*, 153 Conn. App. 691, 697, 103 A.3d 990 (2014), cert. denied, 315 Conn. 913, 106 A.3d 305, cert. denied,      U.S.     , 135 S. Ct. 2386, 192 L. Ed. 2d 172 (2015).

[4] Section 4-3 of the Connecticut Code of Evidence provides that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

[5] The defendant subsequently filed a motion for articulation. The court articulated that it sustained the state's objection because defense counsel did not ask to be heard outside the presence of the jury or to make an offer of proof and did not advance an argument that the statement fit within one of the exceptions to the hearsay rule or articulate the basis of its relevancy.

[6] Connecticut Code of Evidence § 4-4 (a) provides in relevant part: "Character evidence generally. Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except the following is admissible:

"(1) Character of the accused. Evidence of a specific trait of character of the accused relevant to an element of the crime charged offered by an accused, or by the prosecution to rebut such evidence introduced by the accused.

"(2) Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

[7] In this regard, we find it significant that the defendant complied with the evidentiary requirements, albeit unsuccessfully, when he attempted to introduce evidence of the victim's violent character, as reflected in the record of his criminal convictions. In offering the victim's criminal record, the defendant *proffered* that the records were relevant to his claim of self-defense, which distinguishes it from his earlier attempt to place the unidentified woman's purported statement in evidence. In offering the criminal record, the defendant represented that McAllister had testified that the victim was acting in a manner in which the defendant and the victim locked eyes and that is when the defendant shot the victim. In doing so, the defendant attempted to satisfy the required evidentiary foundation. See footnote 6 of this opinion. The court, however, concluded that the evidence that the victim and the defendant "locked eyes" was an insufficient foundation for a claim of self-defense. The court, therefore, denied the defendant's motion to admit the victim's criminal record.

[8] Evidence of a victim's violent character may be admitted, regardless of whether the defendant knew of that character trait, if offered to prove that the defendant acted in self-defense due to the victim's initial aggression. The evidence may be admitted if (1) the defendant lays a proper foundation that he acted in self-defense, and (2) the evidence is introduced as reputation or opinion testimony, or evidence of the victim's conviction of crimes of violence. See Conn. Code of Evid. § 4-4 (a) (2); *State* v. *Smith*, supra, 222 Conn. 17–18. In the present case, the defendant failed to present evidence

that he acted in self-defense, and the purported statement of the unidentified woman was not one of the permitted forms of evidence.

[9] In response to the state's argument that there is no evidence that the defendant heard the unidentified woman's statement, the defendant argues that the jury could have inferred that he heard it because McAllister testified that "at the time of the crime she told us that . . . ." The state objected, and McAllister was instructed not to say what the woman said. There is no evidence as to whom "us" refers, and whether it included the defendant or just McAllister, Romy, and Kahdeem, who were separated from the defendant when he went into his home to get the gun. Just because McAllister heard the woman's statement does not mean the defendant heard it.

[10] On appeal, the defendant also claims that the purported statement was admissible as an excited utterance. The state claims that the defendant did not preserve the claim at trial. During the pretrial hearing on the state's motion in limine with respect to the woman's statement, however, the defendant claimed that the woman's statement was admissible as an excited utterance. The court did not rule on the motion in limine at the time of the hearing, saying it would wait and see how the evidence came in during trial. The court instructed that, "if either side seeks to introduce something that is subject to a pending motion, they need to do that initially outside the presence of the jury. Just so that nobody is surprised by it and that I can officially rule on everything appropriately." During trial, the defendant sought to introduce the woman's statement through McAllister and the state objected. The defendant failed to ask that the jury be excused so that he could make an offer of proof.

[11] The court stated that its ruling did not mean that the toxicology report may not be relevant at some later time. The record does not disclose that the defendant sought to place the toxicology report in evidence at a later time.

[12] The defendant's claim regarding the trial court's alleged failure to admit the toxicology report, which indicated that the victim had PCP in his system at the time of his death, fails for the same reasons articulated in part I A 1 of this opinion.

[13] The court also stated: "And I think that it should be clear, just so that it is clear for the record, that self-defense was something that was discussed . . . early on and throughout the course of this trial and it may have warranted a self-defense charge had the evidence presented itself. It is just that the way that the evidence came in and the case that the jury has now to deliberate on, it is this court's opinion that simply locking eyes is not sufficient to warrant a charge on self-defense."

[14] According to McAllister, the third shot struck the victim as he lay on the ground. Williams' autopsy tends to support McAllister's testimony as the fatal bullet entered the victim's left chest and traveled to the right and slightly downward. See footnote 1 of this opinion.

[15] The Bridgeport police seized the gun in case number 141209. The defendant in that case, Qashad Fields, pleaded guilty to the charges against him and was sentenced in 2015. Apparently, information in Fields' file and the defendant's file were not cross-referenced even though both cases were handled in the same office of the state's attorney.

[16] In his original report, Robinson stated that the shell casings recovered at the scene of the crime were nine millimeter casings; his revised report stated that they were .22 caliber casings. Robinson testified that his field notes indicated that the casings taken at the scene were .22 caliber casings and the error in his report was a scrivener's error. The court did not consider the late disclosure of Robinson's reports to be a discovery violation given that the mistake in Robinson's original report was "pretty clear" given "all of the police reports had consistently indicated a .22 caliber. It was pretty clear that [Robinson's] report was in error in terms of the referencing of a nine millimeter [shell casings] and that [Robinson] then went back and authored a supplemental report to correct that error."

[17] The state acknowledged that the murder weapon and related evidence were not part of pretrial negotiations.

[18] The court stated: "[B]ased upon what I have read, the reports of Marshall Robinson, the arguments that we have had on this matter, make a finding that while it may not certainly be the best practice in terms of how the police departments are able to cross reference this information and make sure that the state's attorneys on the different files are aware of this information, I am going to make a finding that there is no evidence of bad faith. . . .

"[T]he state's attorney, just like defense counsel, is an officer of the court, the indication is that the state's attorney, when she became assigned this particular file, then went to the police department to review all the evidence

and at that moment was told that, in fact, the murder weapon had been recovered in another arrest and then that information was then immediately disclosed to the defense.''

[19] Lieutenant Christopher LaMaine could not confirm that the tools were used to modify the gun. The police seized the tools because a witness stated that the defendant had used a sawed-off gun to shoot the victim. The state argued that the tools were relevant to demonstrate that the defendant had access to them and conceded that the jury may give no weight to them.

[20] In denying the defendant's motion for a new trial, the court stated that the state immediately provided full disclosure and made all witnesses immediately available to the defense, including Robinson. Also, as the court noted, "the defense chose not to meet with or have [Robinson] go over the report or see the evidence, or go over the evidence with [Robinson]. Additionally, the defense chose not to ask for additional time, which this court offered, in terms of the defendant's desire to speak with another expert of [his] own choosing or to provide the evidence to another expert, because it was also part of this court's ruling that the state had to, in fact, provide the physical evidence to the extent that they had anything so that that could be reviewed by [his] own expert to make sure that the police department accommodated any need that the defendant had. And the defense chose not to do that for what were tactical reasons.

"And those reasons are within the defendant's control. So, to say that the late disclosure prohibited the defense from being able to avail itself of its speedy trial rights and/or its rights to a fair trial, I think, is a mischaracterization of what occurred. Certainly, the court was willing and indicated its willingness to entertain a level of continuance on the trial for any need that the defense had. The defense never asked for that and, therefore, the trial continued with its course.

"But again, because we were in jury selection the date certainly could have been modified. And we're not talking about months; we're talking about whatever was necessary. And the defense indicated no necessity for continuance or for bringing in an expert on this issue.

"I will also note for the record that one of the things that occurs is obviously the finding of this evidence made the state's case stronger as opposed to weaker, and, as the defense is indicating, up until this point did not necessarily know that the weapon had been found. And so this court provided the opportunity for the defense to go back down to the pretrial judge, *Devlin, J.*, to then be able to discuss any offers that were on the table at the time that the defendant chose to ask for a trial and a speedy trial in this case.''

[21] In its brief, the state points out that the record discloses that defense counsel made a tactical decision not to talk to Robinson. The following colloquy took place before the presentation of evidence. Defense counsel stated that, although the state made Robinson available to the defendant, Robinson himself was not immediately available.

"[Defense counsel]: I made phone calls to [Robinson], left him a message, he did not return my phone calls, it was not until Monday the thirteenth that he had called that I said, 'Well, maybe we can talk on the fourteenth,' so I just want to make sure that the window was not as large as . . . .

"The Court: Okay.

"[The Prosecutor]: Can I just respond to that though?

"The Court: Yeah.

"[The Prosecutor]: I just want the record to be clear that the state did comply with the court's orders with respect to [Robinson] and I was told yesterday by counsel, 'What is the point.' So, he has not tried to talk to [Robinson], I just want the record to be clear of that. He has made a decision, a tactical decision apparently on his part, and that is all I am going to say. Thank you.

"The Court: All right, so, fair enough. So, what the—what you are both saying is, however, that whether or not the ability to talk to [Robinson] before the thirteenth or fourteenth, that even after having that ability on the thirteenth or fourteenth, the defense has chosen not to pursue that area of inquiry and has not met with or has not asked [Robinson] to review any documents or had their own expert come in and analyze any of the documents. So, that is clear on the record.

"All right, so, we will see everybody in chambers, and we are adjourned until Monday for the beginning of evidence.''

[22] On appeal, tellingly, the defendant failed to explain how a firearms expert could help him reformulate his theory of defense that he shot the victim in self-defense. He speculates that the firearms expert might have

testified that, due to the modification of the gun, it no longer shot accurately and that he did not aim the gun at the victim to kill him. He also failed to explain how he would have known of the gun's inaccuracy, if any.

[23] Although the defendant argues on appeal that there was inadequate time to consult with a firearms expert, he failed to contest the prosecutor's representation before the trial court that he did not consult with Robinson or an expert for tactical reasons. See footnote 21 of this opinion.

[24] The defendant also claims that *State* v. *Festo*, supra, 181 Conn. 265–66, does not adequately protect his rights and that this court should reverse his conviction pursuant to our supervisory powers. A reviewing court's supervisory powers are an "extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009). Even if this court had the power to overrule decisions of our Supreme Court, which it does not; see *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319 (appellate court not at liberty to overrule decisions of Supreme Court), cert. denied, 288 Conn. 902, 952 A.2d 811 (2008); the present case does not present the type of extraordinary situation that our supervisory powers may address.

In addition, the defendant claims that this court should order a new trial because the reliability of firearm and tool mark identification evidence must be established in a *Porter* hearing. See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). The record is inadequate for review of this claim as it was not raised in the trial court. See *State* v. *Medina*, 170 Conn. App. 609, 613–14, 155 A.3d 285, cert. denied, 325 Conn. 914, 159 A.3d 231 (2017).

[25] See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

[26] In *Albino*, however, our Supreme Court did not issue a blanket rule prohibiting a prosecutor from arguing that a defendant murdered a victim "in cold blood" but acknowledged that such an argument may be proper in certain circumstances. It cited cases in which an in cold blood argument was found to be proper, including *Commonwealth* v. *Murphy*, 442 Mass. 485, 496, 813 N.E.2d 820 (2004), in which the Supreme Judicial Court held that a statement that the victims were murdered in cold blood was not improper where the evidence permitted an inference that the murders were unprovoked, senseless, and brutal. See *State* v. *Albino*, supra, 312 Conn. 775. Our Supreme Court also cited *People* v. *Walton*, Docket No. 259584, 2006 WL 2033999, *2 (Mich. App. July 20, 2006), for the proposition that the prosecutor's characterization of the offense as an execution was not improper because it was clearly supported by evidence that the defendant and his accomplices made the unarmed victims lie down on floor and then shot them, and *State* v. *Harris*, 338 N.C. 211, 229, 449 S.E.2d 462 (1994), for the proposition that at a trial for first degree murder involving calculated armed robbery and unprovoked killing, it was not improper for the prosecutor to refer to the defendant as a cold blooded murderer. *State* v. *Albino*, supra, 775.