STATE OF CONNECTICUT *v.* NASIR R. HARGETT
(SC 20517)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of
the victim, the defendant appealed. The victim had approached the
defendant's home, where the defendant and three other individuals,
including M, were talking on the porch. The victim abruptly took a
soda bottle from the porch and immediately left the area without any
confrontation. After the victim left, M and two others left the porch and
began walking toward M's home, in the direction that the victim was
headed. Meanwhile, the defendant went into his home, retrieved a rifle,
and then caught up with M and the others. Near M's home, the victim

regard, we previously have explained that such evidence is admissible only
if (1) it is relevant and material to at least one of the circumstances encom-
passed by the exceptions enumerated under § 4-5 of the Connecticut Code
of Evidence, and (2) its probative value outweighs its prejudicial effect; see
*State* v. *DeJesus*, 288 Conn. 418, 440, 953 A.2d 45 (2008); and we also
have required that the admission of such evidence be accompanied by an
appropriate cautionary instruction to the jury to minimize the risk of undue
prejudice to the defendant. See, e.g., *State* v. *Snelgrove*, 288 Conn. 742, 759,
954 A.2d 165 (2008); see also Conn. Code Evid. § 4-5 (b), commentary. We
have done so because of the inherent risk of prejudice involved in the
admission of this type of evidence. See, e.g., *State* v. *Braman*, 191 Conn.
670, 675, 469 A.2d 760 (1983) ("As a general rule, evidence of guilt of other
crimes is inadmissible to prove that a defendant is guilty of the crime charged
against him. . . . The rationale of this rule is to guard against its use merely
to show an evil disposition of an accused, and especially the predisposition
to commit the crime with which he is now charged." (Citations omitted;
internal quotation marks omitted.)); see also *State* v. *Santiago*, 224 Conn.
325, 347, 618 A.2d 32 (1992) (*Berdon, J.*, concurring and dissenting) ("When
the sole purpose of the other crimes evidence is to show some propensity
to commit the crime at trial, there is no room for ad hoc balancing. The
evidence is then unequivocally inadmissible—this is the meaning of the rule
against other crimes evidence. . . . It is fundamental to American jurispru-
dence that a defendant must be tried for what he did, not for who he is."
(Citations omitted; internal quotation marks omitted.)). Thus, although we
conclude that our trial courts are not required to instruct that a jury find
that prior misconduct evidence "conclusively" supports the issue for which
it was offered, we emphasize and highlight that such evidence is nonetheless
unique and should continue to be handled with great caution.

343 Conn. 604          JUNE, 2022          605

State *v.* Hargett

turned around and locked eyes and exchanged words with the defendant. The defendant then fired his rifle at the victim, and the victim sustained two gunshot wounds. During jury selection, which occurred approximately two and one-half years after the shooting, the prosecutor filed a supplemental notice of disclosure, in which she represented that she recently had become aware of the recovery of the rifle allegedly used by the defendant in the shooting and that she did not have that evidence in her case file until that morning. Although the rifle had been seized by the police in connection with an unrelated robbery that occurred two months after the shooting of the victim, the files in the unrelated robbery case and the defendant's murder case had not been cross-referenced. Although the trial court granted the defense a continuance, which the defense declined, the defendant requested, in light of the state's late disclosure, that the case be dismissed or that the rifle be excluded from evidence. The trial court declined to dismiss the case or to exclude the rifle from evidence. During the defendant's trial, the trial court excluded from evidence M's testimony that, as he was leaving the porch, an unidentified woman told him that the victim had assaulted or robbed her at knifepoint earlier in the day and a toxicology report showing that the victim had drugs in his system at the time of his death. The trial court also declined the defendant's request to charge the jury on his claim of self-defense. The Appellate Court upheld the trial court's rulings, rejected the defendant's claim that the trial court had abused its discretion in declining to dismiss the case or to exclude the rifle from evidence on the basis of the state's late disclosure, and affirmed the defendant's conviction. On the granting of certification, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his claim that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in excluding as irrelevant and inadmissible hearsay M's testimony that an unidentified women told him prior to the shooting that the victim had assaulted or robbed her at knifepoint earlier that day: even if M's testimony was improperly excluded, any error in excluding that testimony was harmless beyond a reasonable doubt, as there was overwhelming circumstantial evidence demonstrating that the defendant had the specific intent to kill the victim, despite his assertion that he was merely trying to scare the victim into leaving the neighborhood rather than trying to kill him; moreover, although the jury may have inferred from M's testimony, if it had been admitted, that the defendant feared the victim, which would have been relevant to the defendant's motive, the probative value of the excluded testimony as to the defendant's specific intent was minimal, as evidence that the defendant feared the victim provided little to no context for why he shot at the victim multiple times; furthermore, there was no merit to the defendant's claim that the exclusion of M's testimony was harmful because it affected his

State *v.* Hargett

entitlement to an instruction on self-defense, as the defendant ultimately failed to establish that he was entitled to such an instruction.

2. The defendant's claim that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in excluding a toxicology report showing that the victim had phencyclidine (PCP) in his system at the time of his death was unavailing; even if the trial court had improperly excluded the toxicology report insofar as it implicated his right to present a claim of self-defense, any error was harmless because, although the evidence would have allowed the jury to reasonably infer that the defendant reasonably feared the victim, the defendant failed to demonstrate that he reasonably believed that deadly force by the victim was imminent and that it was necessary to use deadly force to prevent the victim's use of such force.

3. The Appellate Court correctly concluded that the trial court had not violated the defendant's right to due process by declining to charge the jury on self-defense: although the jury reasonably could have concluded, on the basis of the evidence, that the defendant feared the victim and believed that he possessed a knife, there was no evidence from which the jury could have found that it was objectively reasonable for the defendant to have believed that the victim was using or was about to use deadly force against the defendant and that it was necessary for the defendant to use deadly force himself to prevent the victim from using such force, as there was nothing in the record to indicate that the victim threatened the defendant, acted aggressively, or reached for or brandished a weapon; moreover, the defendant's belief that the victim had a knife, by itself, did not suffice to show that the victim was imminently going to use it, and the victim's alleged possession of a knife, while he was standing still and not acting aggressively, did not demonstrate that the defendant reasonably believed that he needed to use a gun to prevent the victim from using the knife; furthermore, M's statement to the defendant while they were walking toward the victim that the defendant's "life was on the line" did not establish that the defendant would have suffered any harm or risk of harm if he had waited and not fired at the victim or had retreated, as there was no evidence in the record that would have allowed the jury to reasonably infer anything other than that the defendant acted preemptively, which the defense of self-defense did not encompass.

4. The Appellate Court correctly concluded that the trial court had not abused its discretion in declining the defendant's request to dismiss the case or to exclude the rifle as a sanction for the state's late disclosure of that evidence: this court had previously held that a trial court does not abuse its discretion by granting a continuance rather than excluding untimely disclosed evidence unless the defendant shows that his right to a speedy trial has been violated; in the present case, although the state's actions in failing to produce the rifle sooner resulted from a lack of due diligence, and although it was inappropriate for the trial court,

State *v.* Hargett

which granted the defendant a continuance during the course of jury selection, to expect the defense to prepare a response to the new evidence while jury selection was ongoing, the defendant failed to establish that his right to a speedy trial would have been violated if he had accepted an offer of a reasonable continuance of two weeks, even if jury selection had to be paused or to begin anew, and the defendant failed to establish that those two weeks would have been insufficient for the defense to respond to the new evidence; moreover, in light of the trial court's undisputed finding of a lack of bad faith on the part of the prosecution, the trial court's offer of both a continuance and the continuation of plea bargaining in light of the new evidence, and the possibility that the defendant could have received a reasonable continuance without any impact to his right to a speedy trial, the exclusion of the rifle or the dismissal of the case was not the only appropriate remedy for the state's late disclosure; nevertheless, this court observed that the state has a duty to defendants, the public, and the courts to act with diligence in the disclosure of evidence, that courts should in the first instance encourage compliance with this obligation and penalize noncompliance, and that, although the trial court did not abuse its discretion in declining to dismiss the case or to exclude the rifle, the trial court likely would have been well within its discretion to deny the admission of the rifle, especially in light of the fact that the state was apparently ready to proceed to trial without that piece of evidence.

Argued January 13—officially released June 14, 2022

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield, where the court, *Pavia, J.*, denied the defendant's motion for sanctions; thereafter, the case was tried to the jury before *Pavia, J.*; verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the appeal was transferred to the Appellate Court, *Lavine, Elgo* and *Moll, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Jennifer Bourn*, chief of legal services, with whom, on the brief, were *Lauren Graham* and *Shannon Q. Lozier*, certified legal interns, for the appellant (defendant).

State *v.* Hargett

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Ann F. Lawlor*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this certified appeal, the defendant, Nasir R. Hargett, appeals from the judgment of the Appellate Court affirming the trial court's judgment of conviction, rendered after a jury trial, of one count of murder. On appeal, the defendant claims that the Appellate Court incorrectly determined that the trial court had not (1) violated his sixth amendment right to present a defense by excluding from evidence (a) a statement purportedly made by an unknown female bystander and (b) an autopsy toxicology report, (2) violated his right to due process by declining to give a jury instruction on self-defense, and (3) abused its discretion by declining to sanction the state for its late disclosure of the murder weapon and related expert reports by excluding this evidence or dismissing the murder charge. We affirm the Appellate Court's judgment but not without strongly cautioning the state regarding the late disclosure of evidence.

On October 13, 2014, Kaishon McAllister and his friends, Romy and Kahdeem,[1] walked to the defendant's house on East Main Street in Bridgeport. While McAllister, Romy, Kahdeem, and the defendant were talking on the porch of the defendant's home, the victim, Davon Robertson, walked up to the porch, although he did not step onto it, and slowly put his hands in his pockets. Without speaking, the victim grabbed a soda bottle off the porch and then left the area, walking toward Pearl Street.

After the victim moved on, McAllister, Romy, and Kahdeem left the porch and began walking toward McAllister's home on Pearl Street in the same direction

[1] The last names of Romy and Kahdeem are not apparent from the record.

State *v.* Hargett

as the victim. The defendant, however, went into his
home and retrieved a sawed-off rifle. He subsequently
caught up to McAllister, Romy, and Kahdeem, and a
group of young men who were with them. The group
of young men, including the defendant and McAllister,
continued walking toward Pearl Street behind the vic-
tim. Near McAllister's home, the victim turned around.[2]
The defendant and the victim "locked eyes" and exchanged
unknown words. The defendant then fired the gun two or
three times at the victim.[3] McAllister, Romy, and Kahdeem
ran into McAllister's home. The defendant also ran from
the scene but not into McAllister's home. The victim,
who sustained gunshot wounds to his left upper chest
and right lower leg, was taken to Bridgeport Hospital
where he was pronounced dead. No weapon was found
on his body.

Later that day, the police searched the crime scene
and recovered two .22 caliber shell casings and a soda

[2] Although the Appellate Court's opinion states that the victim turned
around in reaction to the defendant's calling out, "yo," the record is unclear
whether the victim turned around of his own accord or in response to the
defendant's speaking to him. McAllister testified that the defendant said
"yo" to the victim, but it is not clear from his testimony whether this occurred
while the defendant was on the porch of his home or on the street before
the victim turned around and "locked eyes" with him.

[3] McAllister gave contradictory testimony as to whether the victim was
facing or turned away from the defendant at the time of the first gunshot.
Additionally, he gave contradictory testimony about the number of gunshots
that were fired. He testified on direct examination that three gunshots were
fired but that only two hit the victim. On cross-examination and redirect,
he testified that the defendant fired three gunshots. Later, on recross-exami-
nation, he testified, "I don't remember," when asked if the defendant had
fired only two gunshots. We note that the Appellate Court based its statement
that the third gunshot was fired while the victim was on the ground on the
testimony of the state's medical examiner, who inferred from the fact that
the bullet to the victim's left upper chest traveled to the right and slightly
downward, that the victim was lying down when he was shot in the chest.
The defendant argues that, as there was no actual testimony that he shot
the victim while the victim was on the ground, this inference is not drawn
in the light most favorable to the defendant, as is required on appellate
review of a self-defense claim. Because the state never argued the medical
examiner's inference to the jury, we do not apply it in reviewing the evidence.

State *v.* Hargett

bottle. They also executed a search warrant at the defendant's home and seized a hacksaw and a file from his bedroom. The defendant was arrested the following day and charged with murder. The state subsequently filed a substitute information charging the defendant with murder and, pursuant to General Statutes § 53-202k, sought an enhancement of his sentence, if convicted, for having used a firearm in the commission of a class A, B or C felony.

At trial, the state relied primarily on the testimony of McAllister, the only eyewitness to testify. The jury subsequently found the defendant guilty of murder.[4] The defendant appealed, and the Appellate Court affirmed the judgment of conviction. See *State* v. *Hargett*, 196 Conn. App. 228, 230, 229 A.3d 1047 (2020). The defendant then sought certification to appeal to this court, which we granted.[5] We will discuss additional facts and procedural history of record as required.

I

The defendant claims that the Appellate Court incorrectly held that the trial court had not abused its discretion in excluding from evidence (a) a statement purport-

[4] In addition, the jury also found, pursuant to an interrogatory, that "the defendant employed the use of a firearm in the commission of a felony," and the court accordingly enhanced his sentence, ultimately imposing a total effective sentence of forty-five years of imprisonment. (Internal quotation marks omitted.) *State* v. *Hargett*, 196 Conn. App. 228, 230, 229 A.3d 1047 (2020).

[5] We limited our grant of certification to the following issues: (1) "Did the Appellate Court correctly conclude that the evidence was insufficient to entitle the defendant to a jury instruction on self-defense?" (2) "Did the Appellate Court correctly conclude that the trial court did not abuse its discretion in excluding as irrelevant evidence that the victim was under the influence of phencyclidine (PCP) at the time of the murder and that a woman had informed a group of individuals, including the defendant, that the victim had just robbed her at knifepoint?" And (3) "[d]id the Appellate Court correctly conclude that the trial court did not abuse its discretion in declining to sanction the state for its late disclosure of the murder weapon and related materials?" *State* v. *Hargett*, 335 Conn. 952, 952–53, 238 A.3d 730 (2020).

State *v.* Hargett

edly made by an unidentified female bystander and (b) the victim's autopsy toxicology report. He argues that this evidence was admissible and relevant and that its exclusion violated his sixth amendment right to present a defense. Even assuming that the trial court improperly excluded this evidence, and that its exclusion violated the defendant's constitutional right to present his claim of self-defense, we conclude that this error was harmless beyond a reasonable doubt.

"A [criminal] defendant has a constitutional right to present a defense, but he is [nonetheless] bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Accordingly, [i]f the proffered evidence is not relevant [or is otherwise inadmissible], the defendant's right to [present a defense] is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *Mark T.*, 339 Conn. 225, 231–32, 260 A.3d 402 (2021). If, however, the trial court improperly excluded the evidence, thereby depriving the defendant of his constitutional right to present his claim of self-defense, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. See *State* v.*Osimanti*, 299 Conn. 1, 16, 6 A.3d 790 (2010).

A

The defendant first claims that the Appellate Court incorrectly concluded that the trial court had not abused its discretion by excluding as irrelevant and inadmissible hearsay McAllister's testimony that an unidentified woman told him prior to the shooting that the victim had assaulted or robbed her at knifepoint earlier in the day. We conclude that any error was harmless.

State *v.* Hargett

At trial,[6] defense counsel elicited from McAllister on cross-examination that, after the victim left the porch of the defendant's house, as McAllister was leaving the porch, an African American woman with purple hair approached him and was yelling. Although defense counsel never asked McAllister if the defendant was present when this unknown woman approached, McAllister did testify that the defendant remained on the porch until McAllister left the porch, at which time the defendant went inside his house. Because McAllister testified that the woman spoke to him as he was leaving the porch, it is unclear whether the defendant heard what she said or whether he already had gone inside his house. When defense counsel asked McAllister what the woman said to him, the prosecutor, with no further specificity, stated: "I'm going to object, Your Honor." The trial court, likewise with no specificity, sustained the objection.[7] In

---

[6] Prior to the start of evidence, the state filed a motion in limine to preclude the defendant from offering any testimony about the unidentified woman. The state argued that such testimony would amount to hearsay and that it was irrelevant and prejudicial and would lead to unfair character evidence as to the victim. Defense counsel responded that he intended to offer the statement as an excited utterance. The trial court reserved ruling on the motion, explaining that either it would wait to see how the evidence came in or that one of the parties could ask for an evidentiary hearing if they believed one was needed. Specifically, the court stated: "[W]hat I'm going to say to both sides is that you have to tell me if either of you are asking for any type of a hearing with regard to this particular motion."

[7] After trial, the court articulated that it had sustained the state's objection because defense counsel did not ask to be heard outside the presence of the jury or to make an offer of proof, and did not advance any argument that the statement came within one of the exceptions to the rule against hearsay or articulate the basis of its relevancy. Although it is not critical to our resolution of this issue, we point out that it was the state that had sought to preclude this evidence by way of a pretrial motion in limine. See footnote 6 of this opinion. The trial court deferred ruling on the motion, stating instead, "let's make sure that we come back to that," and directing *both* parties to bring to the court's attention the issue of how to approach testimony regarding the unknown woman's statement when the appropriate witness testified. Nevertheless, when the defendant asked McAllister what the unknown woman had said, the state merely posed a one sentence objection, which was not followed by a request to excuse the jury. The trial court responded with a one word ruling without waiting to hear the basis for the

State *v.* Hargett

response, defense counsel argued that he was not offering the statement for its truth but "just [to show] that she said it." The trial court, however, explained that "[j]ust the fact that somebody said something certainly doesn't warrant an exception to the hearsay rule."

Even if we assume that the trial court improperly excluded McAllister's testimony as to what the woman said, and that its exclusion implicated the defendant's constitutional right to present his claim of self-defense, we conclude that this error was harmless beyond a reasonable doubt. The defendant first argues that excluding this evidence was harmful because it was relevant to his intent. He argues that, because he was charged with murder, and the court, at the state's request, had given the jury an instruction on the lesser included offense of manslaughter in the first degree with a firearm, McAllister's testimony could have affected the verdict because the jury reasonably could have inferred that the defendant acted out of fear and with the intent to ensure that the victim left the neighborhood, not to kill the victim. Even if this evidence had been admitted, however, there was overwhelming circumstantial evidence of the defendant's specific intent to kill the victim. Specifically, the defendant retrieved a firearm from his home and then followed the victim, who had been walking away from him and evidently was leaving the neighborhood of his own accord. Then, rather than allowing the victim to leave the neighborhood, while the victim was standing still, the defendant shot at him at least twice, based on the number of shell casings and bullets the police recovered from the scene of the crime. This evidence belies any argument that the defendant was merely trying to scare the victim into leaving the neighborhood. The jury could not have reasonably inferred from this evidence that the defendant was merely attempting to

objection. This is not a practice we encourage. See *State* v. *Mark T.*, supra, 339 Conn. 267 n.9 (*Kahn, J.*, concurring in part and dissenting in part).

State *v.* Hargett

scare the victim away from the neighborhood. Rather, in light of the defendant's pursuit of the victim with a firearm and the firing of multiple shots at him, the only reasonable inference the jury could have made was that the defendant intended to kill the victim. Moreover, although the jury may have inferred from this testimony, had it been admitted, that the defendant feared the victim, which would have been relevant to the defendant's motive,[8] its probative value as to the defendant's specific intent at the time of the shooting is minimal. See *State* v. *Miller*, 186 Conn. 654, 666, 443 A.2d 906 (1982) (jury must find that defendant had "specific intent to cause serious physical injury to the victim *at the time of the discharge* of the gun," and, therefore, evidence of "motive at the time [the defendant] took possession of the gun . . . is not the time the jury must focus [on] in finding specific intent" (emphasis added)). Evidence that the defendant feared the victim provides little to no context as to why he shot at the victim multiple times.

The defendant further claims that the exclusion of the evidence was harmful because it affected his entitlement to an instruction on self-defense. Specifically, he argues that this testimony showed that he reasonably feared the victim and reasonably believed the victim to be armed and dangerous, allowing the jury to reasonably infer that the defendant acted out of fear of imminent violence from the victim. We will discuss this argument in detail in part II of this opinion, in which we conclude that, even if this evidence had been admitted, when considered in the light most favorable to the

_____

[8] To the extent the defendant argues that the exclusion of this testimony was harmful because it was relevant to motive, we note, as we will discuss in part II of this opinion, that there was some evidence in the record that the defendant feared the victim. Additionally, exclusion of this evidence of motive was harmless beyond a reasonable doubt because its admission would not have affected the jury's finding of specific intent or whether the defendant was entitled to a self-defense instruction.

State *v.* Hargett

defendant, it would not have affected the verdict because the defendant failed to establish that he was entitled to an instruction on self-defense.

B

The defendant also claims that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in excluding as irrelevant the toxicology report showing that the victim had PCP[9] in his system at the time of his death. He argues that the exclusion of this evidence was not harmless beyond a reasonable doubt because it corroborated McAllister's testimony about the victim's "frightening" behavior, from which the jury could infer that the defendant reasonably feared the victim, thereby supporting his claim of entitlement to an instruction on self-defense.

In its case-in-chief,[10] the state offered the testimony of Susan Williams, an associate medical examiner with the Office of the Chief Medical Examiner, who performed an autopsy of the victim's body. On cross-examination, defense counsel elicited from Williams that, as part of the autopsy, she sent a toxicology specimen to a laboratory for testing and received back a report, which became part of her autopsy report. When defense counsel asked Williams if the victim's toxicology report was made in the ordinary course of business, the state objected on the ground that she did not create the toxicology report. Outside the jury's presence, Williams testified that she did not conduct the toxicology test and that the results of the toxicology report had no impact on

_____

[9] "Phencyclidine, a hallucinogen, is commonly referred to as PCP." *State* v. *Hargett*, supra, 196 Conn. App. 234 n.3.

[10] Prior to the start of evidence, the state filed a motion in limine to preclude the toxicology report, which showed that the victim had PCP in his system at the time of his death, on the grounds of irrelevance and undue prejudice. The trial court reserved its ruling, explaining that its ruling would be based on how the evidence came in during trial and ordering that the parties initially seek to introduce the report outside the presence of the jury.

State *v.* Hargett

her conclusions regarding the cause and manner of the victim's death.

Although the trial court indicated that the business record exception to the rule against hearsay might apply; see Conn. Code Evid. § 8-4; it determined that the toxicology report was irrelevant, as the presence of PCP in the victim's system had no bearing on Williams' conclusions.[11] Defense counsel responded by arguing that there already was evidence in the record that made the results of the toxicology report relevant—namely, McAllister's testimony that the victim "was just out of it" and "looked like he was high off something."[12]

Even if we assume that the trial court improperly excluded the toxicology report and that its exclusion implicated the defendant's constitutional right to present his claim of self-defense, we conclude that this error was harmless beyond a reasonable doubt. Specifically, this evidence would not have affected the verdict, because, as we will discuss in detail in part II of this opinion, although this evidence would have allowed the jury reasonably to infer that the defendant reasonably feared the victim, he failed to lay a sufficient foundation to show that he reasonably believed both that deadly force on the part of the victim was imminent and that it was necessary for him to use deadly force to prevent the victim from using force.

II

The defendant also claims that the Appellate Court incorrectly determined that the trial court had not vio-

_____

[11] The trial court also ruled that hearsay commentary about the effects of PCP contained in the toxicology report was inadmissible without additional evidence. The defendant does not challenge this portion of the trial court's ruling.

[12] The defendant requested and was allowed to make another proffer, during which Williams testified that, although she was familiar with the effects of PCP, she could not say how the victim in the present case was acting at the time of his death based on the toxicology results. Williams explained that she would consider toxicology results only to determine

State *v.* Hargett

lated his right to due process by refusing to charge
the jury on self-defense. He argues that the trial court
incorrectly concluded that there was insufficient evi-
dence to entitle him to a self-defense instruction by "(1)
drawing inferences against the defense, (2) ignoring
reasonable inferences that could be drawn in the defen-
dant's favor, and (3) focusing on what the court believed
a reasonable juror would do instead of what a reason-
able juror could find on this record." We disagree.

The following additional facts, viewed in the light
most favorable to the defendant, are relevant to this
claim. The jury could have credited McAllister's testi-
mony that, while McAllister, Romy, Kahdeem, and the
defendant were talking on the porch of the defendant's
home, the victim walked up to the porch, appearing to
be "high." Specifically, the victim seemed "out of it"
and was not interacting with the young men on the
porch. McAllister thought this behavior was odd, but
it did not make him fearful of the victim.[13] The victim
then slowly reached into his pockets, which made
McAllister nervous because he did not know if the vic-
tim had a weapon and thought that "[the] porch could've
got[ten] shot up." As a result, McAllister, Romy, and
Kahdeem went inside the defendant's house and closed
the door behind them. The defendant remained on the
porch. At some point, the victim grabbed a soda bottle
that McAllister had set down on the porch and then
left the area, walking toward Pearl Street. At no point
during this interaction did the victim speak, brandish
a weapon, or step onto the porch.

After the victim walked away from the defendant's
house, McAllister began walking home in the same direc-
tion, and the defendant went into his home. McAllister

whether the amount of a narcotic in a person's system was significant
enough to be the cause of death.

[13] Specifically, McAllister was asked if "the fact that he had this—that
[the victim] appeared to be high, did that add to your fear?" McAllister
responded: "No."

State *v.* Hargett

believed that the defendant intended to call the police. Instead, the defendant retrieved a wooden, sawed-off rifle and, shortly thereafter, caught up to McAllister and the group of young men. While walking next to the defendant, McAllister said to him: "[W]hatever you do, don't do this . . . don't do this like your life is on the line." Near McAllister's home, the victim turned around and "locked eyes" with the defendant. Although the defendant and the victim exchanged unknown words, the victim did not make any threats, reach into his pockets, or brandish any weapon. The defendant then fired the gun two or three times at the victim, who was standing still. McAllister, who was "in shock" when he saw the victim lying on the ground, then ran into his apartment with Romy and Kahdeem. The defendant fled the scene. No weapon was found on the victim's body.

As discussed previously, to bolster McAllister's testimony that the victim was "high," the defendant unsuccessfully sought to admit into evidence the toxicology report attached to the medical examiner's autopsy report, which showed that the victim had PCP in his system at the time of his death. See part I B of this opinion. Additionally, defense counsel unsuccessfully attempted to elicit testimony from McAllister that, as he was leaving the defendant's porch, he heard an unidentified woman state that the victim had robbed or assaulted her at knifepoint earlier that day. See part I A of this opinion.

Following evidence, defense counsel, via e-mail, requested that the trial court charge the jury on the defense of self-defense, although he provided no specific language.[14] Subsequently, on the record, defense

---

[14] After trial, defense counsel moved to rectify the trial court record to include a copy of his request to charge on self-defense. The trial court initially denied the motion, as the defendant never filed a request to charge. Subsequently, the defendant moved for review of the trial court's denial of his motion for rectification, which the Appellate Court granted. As a result, the record was rectified to include the e-mail defense counsel had sent to the trial court, in which he generally requested a charge on self-defense.

State *v.* Hargett

counsel contended that there was sufficient evidence
to warrant a self-defense instruction, arguing that "there
was evidence from . . . McAllister that [the defendant
and the victim] locked eyes, and there appear[ed] to
be some sort of exchange between the two and then,
per [McAllister's] testimony, [the defendant] fired gun-
shots." The state objected, arguing that there was no
evidence to warrant an instruction on self-defense. The
trial court again agreed with the state and declined to
issue the instruction, explaining that, "just the idea of
locking eyes, without more, is not enough to at least
make some level of a finding that self-defense has now
become part of this case."

A review of the principles related to a defendant's
claimed right to a self-defense instruction is useful at
the outset of our discussion. Whether the defendant
was entitled to a self-defense instruction is an issue of
law, subject to plenary review. See, e.g., *State* v. *Lewis*,
245 Conn. 779, 809, 717 A.2d 1140 (1998). A defendant's
due process right to a fair opportunity to establish a
defense "includes proper jury instructions on the ele-
ments of self-defense so that the jury may ascertain
whether the state has met its burden of proving beyond
a reasonable doubt that the assault was not justified.
See General Statutes § 53a-12 (a). . . . Thus, [i]f the
defendant asserts [self-defense] and the evidence indi-
cates the availability of that defense, such a charge is
obligatory and the defendant is entitled, as a matter of
law, to [an] . . . instruction [on self-defense]. . . .

"Under our Penal Code[15] . . . a defendant has no
burden of persuasion for a claim of self-defense; he

[15] "The [defense] of self-defense . . . [is] codified [at General Statutes]
§ 53a-19 (a), which provides in relevant part: [A] person is justified in using
reasonable physical force upon another person to defend himself . . . from
what he reasonably believes to be the use or imminent use of physical force,
and he may use such degree of force which he reasonably believes to be
necessary for such purpose; except that deadly physical force may not be
used unless the actor reasonably believes that such other person is (1) using
or about to use deadly physical force, or (2) inflicting or about to inflict

State *v.* Hargett

has only a burden of production. That is, he merely is required to introduce sufficient evidence . . . [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. . . . This burden is slight, however, and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . .

"An instruction on a legally recognized theory of defense, however, is warranted only if the evidence indicates the availability of that defense. . . . The trial court should not submit an issue to the jury that is unsupported by the facts in evidence. . . .

"[T]o submit a [self-defense] defense to the jury, a defendant must introduce evidence that the defendant reasonably believed [the attacker's] unlawful violence to be imminent or immediate. . . . Under [General Statutes] § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that [the] attacker is using or about to use deadly force against [himself] and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . . [I]n reviewing the trial court's rejection of [a] defendant's request for a jury charge on [self-defense], we . . . adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Citations omitted; footnote added; footnote omitted; internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 832–36, 60 A.3d 246 (2013).

great bodily harm." (Internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 832, 60 A.3d 246 (2013).

State *v.* Hargett

As to whether the defendant had a reasonable belief that the attacker was using or was about to use deadly force, it is not enough for a defendant to fear the victim to entitle him to an instruction on self-defense. Rather, "a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be 'imminent' . . . ." *State* v. *Carter*, 232 Conn. 537, 545–46, 656 A.2d 657 (1995). Evidence of imminent violence "must be such that the jury must not have to resort to speculation in order to find that the defendant acted in justifiable self-defense." *State* v. *Lewis*, supra, 245 Conn. 811.

As to whether the defendant had a reasonable belief that deadly force was necessary to repel the attacker's use of deadly force, there are "two essential parts [to this] necessity requirement," which are that "force should be permitted only (1) when necessary and (2) to the extent necessary. The actor should not be permitted to use force when such force would be equally as effective at a later time and the actor suffers no harm or risk by waiting." (Internal quotation marks omitted.) *State* v. *Bryan*, supra, 307 Conn. 833. For example, if the only evidence in the record shows that the victim was fleeing at the time the defendant used deadly force, then a self-defense instruction is unnecessary because the record could not support a finding that it was objectively reasonable for the defendant to have believed both that the victim was about to use deadly physical force and that it was necessary for the defendant to use deadly force to prevent such conduct. See *State* v. *Erickson*, 297 Conn. 164, 197, 997 A.2d 480 (2010); *State* v. *Anderson*, 201 Conn. App. 21, 36–38, 241 A.3d 517, cert. denied, 335 Conn. 984, 242 A.3d 105 (2020). "[T]he defense of self-defense does not encompass a preemptive strike . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 320 Conn. 22, 54, 128 A.3d 431 (2015).

State *v.* Hargett

In several cases, this court has upheld the trial court's refusal to give a self-defense instruction when, despite evidence of the defendant's fear of the victim, the record contained no evidence that deadly force by the victim was imminent or that deadly force was necessary to repel an imminent attack by the victim. For example, in *State* v. *Lewis*, 220 Conn. 602, 617–20, 600 A.2d 1330 (1991), the defendant shot and killed the victim and posited a defense of self-defense. At trial, there was testimony that the defendant feared the victim, whom he believed to be a dangerous drug dealer, and that he killed the victim because he thought the victim would have killed him at some future point. Id., 619–20. This court explained that this "evidence, if credited, would have allowed the jury to believe that the defendant feared for his life." Id., 620. This evidence, however, did not establish that, at the time of the shooting, it was reasonable for the defendant "to believe that the victim was about to use deadly physical force or inflict great bodily harm, and that it was necessary to kill the victim to prevent such conduct." Id. Rather, this court described the defendant's actions as "a preemptive strike," which the defense of self-defense does not encompass. Id.

Similarly, in *State* v. *Bryan*, supra, 307 Conn. 832–39, the defendant stabbed the victim and claimed self-defense and defense of others, the latter of which is governed by the same legal principles as those applicable to a claim of self-defense.[16] Construing the facts in the light most favorable to the defendant, we determined that the jury reasonably could have concluded that the victim was a violent person who previously had threatened the defendant. See id., 836. The defendant was aware of this violent history, feared the victim, and believed that he was a threat. Id. However, there

---

[16] The defendant in the present case did not raise the defense of defense of others.

State *v.* Hargett

was no evidence in the record that, "at the time [the defendant] stabbed the victim, it was objectively reasonable for him to believe that it was necessary to do so in order to defend" his girlfriend, who was with him. (Emphasis omitted.) Id., 836–37. Specifically, the evidence showed that, although there was a brief struggle between the defendant, his girlfriend and the victim, at the time of the shooting, the victim was running away, in the opposite direction from the defendant and his girlfriend. Id., 837–38. Based on the record, this court concluded that no evidence permitted a reasonable jury to infer, without resorting to speculation, that the victim was "using or about to use deadly physical force" against the defendant's girlfriend. (Internal quotation marks omitted.) Id., 838. As a result, we held that the trial court properly declined to instruct the jury on defense of others. See id., 839.

We now turn to the present case. We conclude that the trial court properly declined to instruct the jury on self-defense. Adopting the version of the facts most favorable to the defendant, including evidence the trial court arguably excluded erroneously, we have little trouble determining that the record evidence, if credited, would have sufficed for a reasonable jury to conclude that he feared the victim and believed he was armed with a knife.[17]

---

[17] We agree with the defendant that there was more evidence in the record from which the jury could infer that he feared the victim than the fact that he and the victim "locked" eyes. Specifically, the jury could have credited McAllister's testimony that, when the victim approached the defendant's porch, the victim's act of putting his hands into his pockets as he acted "out of it" and "looked like he was high" made McAllister nervous. From this testimony, which would have been corroborated by the results of the toxicology report, assuming the report had been admitted, the jury could have inferred that the defendant likewise was fearful of the victim at that moment based on his demeanor and conduct. Although the jury could have inferred that the defendant did not fear the victim when the victim approached the porch because the defendant remained on the porch and did not flee inside the house, as McAllister did, considering this testimony in the light most favorable to the defendant, the jury also could have inferred

State *v.* Hargett

Evidence of fear alone, however, is insufficient to entitle the defendant to an instruction on self-defense because there was no evidence from which a reasonable jury could find that it was objectively reasonable for him to have believed both that the victim was using or about to use deadly force and that it was necessary for the defendant to use deadly force to prevent the victim from using that force. In the moments leading up to the shooting, the victim was walking away from the defendant. Although it is not clear why the victim eventually turned around, "lock[ing] eyes" with the defendant and exchanging unknown words, there is no evidence that the victim threatened the defendant, acted aggressively, reached for a weapon, or brandished a weapon. Rather, the evidence in the record shows only that the victim stood still as the defendant shot at him. The fact that the defendant believed that the victim had a knife by itself does not suffice to show that the victim was imminently going to use it. Nor does the victim's alleged possession of a knife, while standing still and not acting aggressively, provide any foundation to show that the defendant reasonably believed that he needed to use a gun to prevent the victim from using the knife.

The defendant contends, however, that McAllister's testimony that he told the defendant, "your life is on the line," was evidence of the defendant's belief that the victim posed an imminent threat to his life. Although the jury could have inferred this testimony to mean that the defendant and McAllister subjectively believed that

from this same evidence that the defendant was fearful. This favorable inference is supported by McAllister's testimony that, after the victim walked away from the porch, the defendant went into his house and then came out with a firearm, from which the jury could have inferred that the defendant believed the victim presented a threat. The jury also could have credited McAllister's testimony, if it had been admitted, that an unknown woman told him that the victim had robbed or assaulted her at knifepoint earlier in the day. Even if we assume that the defendant likewise heard this statement, the jury reasonably could have inferred that it bolstered the defendant's fear of the victim and led him to believe that the victim had a knife.

State *v.* Hargett

the victim presented an imminent threat,[18] to be entitled
to an instruction on self-defense, the defendant had to
provide a foundation that the defendant also *reasonably*
*believed* that the victim presented an *imminent threat*
of deadly physical force. As discussed, at the time of
the shooting, there was no such evidence. McAllister's
statement to the defendant does not establish even the
slightest possibility that, had the defendant waited and
not fired at the victim or, more appropriately, decided
not to follow the victim or retreated, he would have
suffered any harm or risk of harm. No evidence in the
record would allow the jury to reasonably infer anything
other than that the defendant acted preemptively, which
the defense of self-defense does not encompass. Accord-
ingly, reviewing the facts in the light most favorable to
the defendant and even assuming that the trial court
should have admitted the unidentified woman's state-
ment and the results of the toxicology report, we con-
clude that the defendant failed to meet his burden of
production to establish a foundation for the jury to infer
that it was objectively reasonable for him to believe it
was necessary to shoot the victim to defend himself
from imminent deadly force. Therefore, the Appellate
Court correctly held that the defendant was not entitled
to an instruction on self-defense.

III

Finally, the defendant challenges the Appellate Court's
conclusion that the trial court did not abuse its discre-
tion in declining to sanction the state for its late disclo-
sure of the murder weapon and related expert reports.
He argues that the late disclosure was caused by the
state's "egregious lack of diligence" and deprived him
of his right to adequately prepare his defense. Specifi-

---

[18] The jury, however, also reasonably could have inferred this testimony
to mean that McAllister was warning the defendant that his intention to
shoot the victim could ruin the defendant's life if he were arrested and
charged with murder.

State *v.* Hargett

cally, the defendant contends that, because he had invoked his right to a speedy trial; see U.S. Const., amend. VI; General Statutes § 54-82m; the only appropriate remedy was either exclusion of the evidence or dismissal of the murder charge, and the trial court's offer of a continuance to temper any prejudice improperly forced him to choose between his constitutional right to a speedy trial and his constitutional right to prepare his defense.

On the record before us, we cannot agree that the trial court abused its discretion. But, the issue is a close one. In our view, the trial court did the best it could with a situation created by governmental mistake, indifference, or ineptitude, and we caution the state that it must be more diligent in complying with its obligation to disclose evidence timely, and we admonish trial courts to enforce this obligation.

The following facts are relevant to the defendant's claim. At the defendant's arraignment on October 14, 2014, the court appointed a public defender to represent him. On March 11, 2015, the defendant requested that the state disclose any tangible objects, documents, and reports or statements of experts, including the results of physical examinations or scientific tests that the state intended to offer into evidence during its case-in-chief or that were material to the defendant's case. The court placed the case on the trial list on September 29, 2015. New counsel appeared for the defendant on October 24, 2016, and filed a motion for a speedy trial on February 21, 2017. The court granted the speedy trial motion, and jury selection began on February 27, 2017. Jurors were informed that evidence would begin on March 20, 2017.

When jury selection began, the state already had timely disclosed Marshall Robinson, a firearms expert whom it intended to call as a witness at trial. At that time, the state disclosed only that Robinson would tes-

State *v.* Hargett

tify regarding a report he created in which he concluded that both .22 caliber shell casings recovered from the crime scene in the present case had been fired by the same gun.[19] At the time Robinson created the report in October, 2014, the murder weapon had not yet been discovered and, thus, was not examined by Robinson.

On March 7, 2017, in the midst of jury selection, the state filed a supplemental notice of disclosure regarding what it claimed was newly discovered evidence: namely, the murder weapon, a sawed-off rifle that recently had been recovered. In fact, the Bridgeport police had seized the gun in connection with an unrelated robbery that occurred in December, 2014. Robinson examined the weapon from that robbery in December, 2014, and realized that it might be associated with the present case, leading him to also examine the weapon in relation to this case. The defendant in the robbery case pleaded guilty to the charge against him and was sentenced in 2015. Although that case and the defendant's case were not handled by the same prosecutor, both were handled by the same state's attorney's office. Therefore, presumably, that state's attorney's office had knowledge of the information concerning the weapon, but the defendant's file and the other file had not been in any way cross-referenced.

In addition to disclosing the murder weapon, the state also supplemented its March 7, 2017 disclosure with two reports generated as a result of Robinson's exami-

---

[19] In his original report, Robinson stated that the shell casings recovered at the scene of the crime were nine millimeter casings. He amended his report on the eve of trial to state that they were .22 caliber casings. Robinson testified that his field notes indicated that the casings recovered from the crime scene were .22 caliber casings and that the error in his report was a scrivener's error. The trial court ruled that the amendment to Robinson's original report did not constitute a late disclosure of evidence but, rather, an amendment to correct a scrivener's error and that defense counsel could address the timing of this amendment on cross-examination of Robinson, which he did.

State *v.* Hargett

nation of the murder weapon in December, 2014. Despite Robinson's having realized the connection between the weapon and the present case, and his creation of these reports in December, 2014, the reports never were included in the defendant's file, and the prosecutor in the present case was not personally aware of them until March 7, 2017.[20] In these untimely disclosed supplemental reports, Robinson classified the recovered gun as a Marlin model 980 caliber .22 long rifle and concluded that the two .22 caliber shell casings recovered from the crime scene had been fired from this rifle. On March 9, 2017, Robinson further supplemented the untimely disclosed reports by including his conclusions that one of the bullets recovered from the victim's body was fired from the rifle but that he was unable to determine if another bullet fragment recovered from the victim's body had been fired from this rifle.

Defense counsel objected to the late disclosure, stating that he had not had sufficient time to review the new evidence and had concerns regarding prejudice to the defendant, especially as he alleged that the police had possession of the gun for more than two years. The prosecutor clarified that she did not have this evidence in her file regarding the defendant until that morning and disclosed it as soon as she was aware of it. Defense counsel requested time to review everything and to be heard at a later date. The trial court ordered the state to make Robinson available to the defense in an "expedited fashion" and to make the weapon available for review by the defense.

On March 13, 2017, the defendant filed a motion for sanctions, arguing that, regardless of the prosecutor's personal knowledge, the state was aware of the gun's existence for more than two years and that the late disclosure prejudiced him by preventing him from inspect-

---

[20] The record does not reveal where these untimely disclosed reports were kept prior to March 7, 2017.

State *v.* Hargett

ing and/or testing the gun during pretrial discussions and by denying him adequate time to properly prepare his defense by the March 20, 2017 trial date. He further argued that a continuance was not a proper remedy because it would force him to choose between his constitutional right to a speedy trial and his constitutional right to prepare a defense. Thus, the defendant requested either dismissal of the murder charge or the exclusion of the gun and associated reports from evidence. The state responded that the defendant had suffered no prejudice from the late disclosure because, in the ten days since the disclosure, he had taken no steps to prepare his defense, including consulting with Robinson, attempting to retain and consult with his own expert, or inspecting the gun.

The court ruled that, although the state's disclosure of the gun was clearly late and that the state's attorney's office and the Bridgeport Police Department clearly had not employed the "best practice" to ensure compliance with discovery requirements in both files, the court found "no evidence of bad faith." Addressing the appropriate remedy for the late disclosure, the court also did not find sufficient prejudice to justify either dismissal of the murder charge or exclusion of the evidence.[21] Specifically, the court noted that it had been ten days since the untimely disclosure and that it had offered the defendant the opportunity to speak with Robinson, inspect the gun, request a continuance, and retain its own firearms expert. The court found that the defendant chose not to avail himself of any of these options.[22]

---

[21] The court explained that it considered "the prejudice that has resulted by way of this late disclosure to the defense, the amount that it would affect the . . . ability [of the defense] to form a proper defense to participate in the plea negotiations, to acquire expert testimony, to have any examination of their own with regard to any of these items and the extent to which it would affect the . . . ability [of the defense] to really decide a strategy and a defense for the trial itself."

[22] The prosecutor represented that defense counsel had responded, "what's the point," when the state offered to have Robinson speak with him.

State *v.* Hargett

The court found that, "at this juncture, there is no evidence that the late disclosure has provided such prejudice to the defense or to the accumulation of [its] ability to try this case or form a proper defense for purposes of trial such as to warrant a granting of a motion to dismiss or a granting of a motion to exclude, in total, the evidence." However, because the gun and associated reports were not disclosed at the time of plea negotiations, the trial court found that the late disclosure had prejudiced the defendant with respect to plea negotiations, stating that it would allow him to "go back and participate in any plea negotiations," if he so requested.

At trial, Robinson testified that both .22 caliber shell casings the police found at the crime scene were fired from the Marlin .22 caliber sawed-off rifle that the state entered into evidence. He also testified that the bullet recovered from the victim's body was fired from this same rifle but that the bullet fragment recovered from the victim's body was too damaged for him to conclude that it also was fired from this rifle. He further testified that portions of the firearm, including the barrel, buttstock, and forearm, had been altered and/or sawed off. He testified that the tool marks on the barrel of the gun could have been made by the file found in the defendant's bedroom or "another one like it."

Following the verdict, the defendant moved for a new trial on the ground that the state's late disclosure and the court's failure to exclude the gun and associated reports deprived him of his right to prepare a defense. The court denied the motion.

Recently, in *State* v. *Jackson*, 334 Conn. 793, 224 A.3d 886 (2020), this court detailed the relevant standard of review and legal principles applicable in determining whether the trial court had imposed an appropriate sanction for the state's late disclosure of evidence: "Practice Book § 40-11 (a) (3) [requires that] upon writ-

ten request by a defendant, the state shall disclose any reports or statements of experts made in connection with the offense charged including results of . . . scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . . The state has a continuing duty to disclose such documents, and, if there is a failure to comply with disclosure, the trial court must take appropriate action, including the imposition of an appropriate sanction. . . .

"Practice Book § 40-5 [grants] broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery. . . . The court may enter such orders as it deems appropriate, including . . . (2) [g]ranting the moving party additional time or a continuance . . . (4) [p]rohibiting the noncomplying party from introducing specified evidence . . . (5) [d]eclaring a mistrial . . . [or] (8) [e]ntering such other order as it deems proper. Practice Book § 40-5. [T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with [court-ordered] discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. . . . As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue is whether the trial court could reasonably conclude as it did. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter

State *v.* Hargett

so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors.'' (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 334 Conn. 810–11.

In *Jackson*, the state untimely disclosed an expert in cell site location information seven days before the start of evidence, despite knowing for at least two months that it anticipated calling the expert to testify. Id., 812–13. Although it found the delay avoidable, the trial court denied the defendant's request for a six week continuance, without considering a shorter continuance. Id., 809, 813. On appeal, this court agreed with the trial court that the delay was avoidable: ''The state's failure to prepare for trial in a timely fashion is not a valid reason for a late disclosure of an expert witness to the defense.'' Id., 813. We concluded that the trial court abused its discretion, however, in failing to afford the defendant a reasonable continuance to obtain his own expert, although not necessarily six weeks long. See id., 816. In so holding, we noted that ''[a] continuance is ordinarily the proper method for dealing with a late disclosure. . . . A continuance serves to minimize the possibly prejudicial effect of a late disclosure . . . .'' (Internal quotation marks omitted.) Id., 815. By comparison, we have classified a defendant's request for suppression of the evidence, dismissal of all charges, or a mistrial as ''severe sanction[s] which should not be invoked lightly.'' (Internal quotation marks omitted.) *State* v. *Festo*, 181 Conn. 254, 265, 435 A.2d 38 (1980).

Consistent with these principles, in prior cases involving untimely disclosed evidence, if the trial court offered the defendant a continuance but denied a request for suppression and/or dismissal, our appellate courts have concluded that the trial court did not abuse its discretion ''by affording the defendants more time to examine and analyze the evidence in lieu of granting their motions for a mistrial and motions for suppression of evidence,''

State *v.* Hargett

especially if the state did not act in bad faith. Id., 266;
see also *State* v. *Troupe*, 237 Conn. 284, 312, 677 A.2d
917 (1996) (trial court did not abuse its discretion when
it denied suppression of untimely disclosed evidence
but granted continuance); *State* v. *Beaulieu*, 118 Conn.
App. 1, 7–9, 982 A.2d 245 (defendant did not demon-
strate prejudice when he did not accept court's offer
of additional time to investigate two witnesses), cert.
denied, 294 Conn. 921, 984 A.2d 68 (2009). Although a
continuance may not always be a sufficient remedy for
the untimely disclosure of evidence, suppression of the
evidence, dismissal of all charges, or a mistrial is a
severe sanction that courts should invoke only when
absolutely necessary.

In the present case, however, the defendant argues
primarily that, although the trial court offered him a
continuance and he declined, he nonetheless suffered
significant prejudice because he had filed a speedy trial
motion, which the court granted. The trial court's offer,
he contends, required him to choose between his right
to a speedy trial, which a continuance would have delayed,
and his right to present a defense, which would have
been hindered without a continuance. As a result, he
argues, the only proper remedy for the untimely disclo-
sure was either suppression of the gun, expert reports,
and expert testimony or dismissal of the murder charge.

We have recognized that "[a] defendant in a criminal
proceeding is entitled to certain rights and protections
[that] derive from a variety of sources. He is entitled
to all of them; he cannot be forced to barter one for
another. When the exercise of one right is made contin-
gent [on] the forbearance of another, both rights are
corrupted." (Internal quotation marks omitted.) *State*
v. *Francis*, 317 Conn. 450, 466, 118 A.3d 529 (2015).
When two separate constitutional rights "are not mutu-
ally exclusive and vindicate different interests, we find
it intolerable that one constitutional right should have

State *v.* Hargett

to be surrendered in order to assert another.'' (Internal quotation marks omitted.) *State* v. *Wang*, 312 Conn. 222, 239, 92 A.3d 220 (2014).

We are aware of no case law from this court or any federal courts holding that the fundamental protections of due process and the right to a speedy trial are mutually exclusive. Rather, in the context of late disclosure of evidence, this court has held that a trial court does not abuse its discretion by granting a continuance rather than excluding the untimely disclosed evidence unless the defendant shows that his federal constitutional right to a speedy trial was actually violated.[23] See, e.g., *State*

---

[23] The defendant cites four cases from other states to support his argument that untimely disclosure of evidence after the trial court has granted a defendant's motion for a speedy trial necessarily requires suppression of the evidence or a mistrial because the offer of a continuance improperly forces the defendant to choose between his right to a speedy trial and his right to present a defense. Two of these cases, however, do not stand for that proposition. Rather, these cases hold that a defendant does not waive his right to a speedy trial if he consents to or requests a continuance as a result of the state's untimely disclosure of evidence. See *Feast* v. *State*, 126 So. 3d 1168, 1169–70 (Fla. App. 2012); *Dillard* v. *State*, 102 N.E.3d 310, 312–13 (Ind. App. 2018). In those cases, the applicable rules of practice required the defendant's trial to begin within a certain time frame, otherwise the defendant would waive his right to a speedy trial, and the issue before the appellate courts was whether the defendant's agreement to or request for a continuance as a remedy for the state's late disclosure of evidence tolled the waiver of this right. These courts answered this question in the affirmative.

As to the third case, *State* v. *Brooks*, 149 Wn. App. 373, 392–93, 203 P.3d 397 (2009), the court did hold that a continuance was not an adequate remedy based on the specific facts of that case, in which the court described the state's actions as ''a total failure to provide [any] discovery in a timely fashion . . . .'' (Internal quotation marks omitted.) Id., 388. That case, however, does not hold that any time a defendant has invoked his right to a speedy trial, a continuance is an inadequate remedy for the state's late disclosure of evidence.

As to the fourth case, *Jimenez* v. *Chavez*, 234 Ariz. 448, 453, 323 P.3d 731 (App. 2014), the court held that a continuance was not an appropriate remedy when the continuance would have meant that the defendant was required to waive his right to a speedy trial under Arizona's rules of practice, which required a defendant in custody to be tried within 150 days of arraignment. As we discuss in this opinion, the defendant in the present case could have

State *v.* Hargett

v. *Troupe*, supra, 237 Conn. 313 ("[T]he defendant has not demonstrated any prejudice flowing from the late disclosure of the report, with respect to either his speedy trial rights or his ability to present a defense. Accordingly, the defendant has not satisfied his burden of establishing that the trial court improperly failed to prohibit the state from introducing the test results." (Footnote omitted.)). In the present case, because the defendant declined the trial court's offer of a continuance, we must determine whether a reasonable continuance, if accepted by the defendant, would have violated his right to a speedy trial.

"In *Barker* v. *Wingo*, [407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)], the United States Supreme Court adopted a four factor balancing test to determine whether a defendant's speedy trial right has been violated." *State* v. *Smith*, 289 Conn. 598, 612 n.17, 960 A.2d 993 (2008). The court explained that "the determination of whether such rights have been violated requires a case-by-case approach in which the court examines the [relevant] factual circumstances [including] . . . [the] [l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Internal quotation marks omitted.) Id., 613. "[T]he question of whether the defendant's claims of injury to his defense constitute sufficient prejudice to establish a denial of the right to a speedy trial can only be answered after examining the other factors in the case. Greater specificity and harm must be shown [when] the other factors weigh in the state's favor, while a lesser showing will constitute sufficient prejudice when the other facts support a defendant's argument." *State* v. *L'Heureux*, 166 Conn. 312, 319, 348 A.2d 578 (1974).

The defendant's argument in the present case implicates the third *Barker* factor, the defendant's assertion

received a continuance without waiving his right to a speedy trial under our court rules.

State *v.* Hargett

of his right to a speedy trial. Our appellate courts have analyzed this factor in light of a defendant's statutory right to a speedy trial. Specifically, a defendant's claim that his right to a speedy trial has been violated is weaker if he failed to assert his statutory right to a speedy trial. See *State* v. *Lacks*, 58 Conn. App. 412, 419, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000); see also *State* v. *Rosario*, 118 Conn. App. 389, 399–400, 984 A.2d 98 (2009), cert. denied, 295 Conn. 903, 988 A.2d 879 (2010). Even if a defendant asserts this right, however, such assertion "is afforded little weight in the *Barker* balancing test" if trial commences within the statutorily provided time period. Id. In Connecticut, the defendant's statutory right to a speedy trial is codified at § 54-82m[24] and Practice Book § 43-41,[25] which provide that, if the defendant's trial does

[24] General Statutes § 54-82m provides: "In accordance with the provisions of section 51-14, the judges of the Superior Court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) of this section and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1) of this section."

[25] Practice Book § 43-41 provides: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day

State *v.* Hargett

not begin within twelve months from the filing of the information or from the date of his arrest, whichever is later, he may file a motion for a speedy trial. If, in the absence of "good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period." Practice Book § 43-41. Commencement of a trial is defined as "the commencement of the voir dire examination in jury cases and the swearing-in of the first witness in nonjury cases." Practice Book § 43-42. Thus, if, pursuant to a defendant's state law guarantees; see General Statutes § 54-82m; Practice Book § 43-41; trial commences within thirty days of his filing of a motion for a speedy trial, the defendant's constitutional claim is of little merit.

In the present case, the defendant filed his speedy trial motion on February 21, 2017. Under § 54-82m and Practice Book § 43-41, he therefore was entitled to a trial that commenced—defined as the beginning of jury selection—by March 23, 2017. Jury selection in fact began on February 27, 2017, well within the time period outlined by § 54-82m and Practice Book § 43-41. On March 7, 2017, in the midst of jury selection, the state untimely disclosed the evidence at issue. Jury selection ended on March 17, 2017, the same day the court heard oral argument on the defendant's motion for sanctions. After the defendant declined the trial court's offer of a continuance, evidence began on March 20, 2017.

The defendant argues that the trial court and the Appellate Court incorrectly focused on the ten day time

period. For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. When good cause for delay exists, the trial shall commence as soon as is reasonably possible. Failure of the defendant to file a motion to dismiss prior to the commencement of trial shall constitute a waiver of the right to dismissal under these rules."

period between the state's disclosure and oral argument on his motion for sanctions, arguing that this period of time was insufficient to prepare his defense—including time to speak with Robinson, inspect the gun, and to retain and meet with his own expert—all while continuing to participate in jury selection. We agree with the defendant that it was inappropriate to expect him to prepare a response to the untimely disclosure of a firearm and associated expert reports during those ten days, all while jury selection continued. Turning the government's failure—including the mistakes by the prosecutor's office and the police—into the defendant's problem, and thereby saddling his counsel with an additional burden while picking a jury and preparing for trial, is not a remedy for the untimely disclosure of expert evidence. Nor is it a satisfactory response to this government created dilemma that defense counsel did not even try to speak to Robinson under these circumstances. Like any trial lawyer, counsel had to make judgments, whether they are called ''tactical'' or by some other name, about how to spend the precious days and hours before trial, and it is hardly fair—and not helpful to our analysis—to criticize counsel for failing to take steps to manifest or mitigate harm created by the errors of a variety of state actors.

The defendant's argument, however, has failed to establish that a reasonable continuance of two weeks would have caused his trial to begin beyond the statutory deadline, even if jury selection had to be paused or to begin anew. At the time of the state's disclosure, March 7, 2017, the defendant could have requested a two week continuance and still have had jury selection recommence, or begin anew, by March 21, 2017, within the statutory deadline. Additionally, the defendant has not shown that two weeks would have been insufficient time for him to speak with Robinson, inspect the gun, attempt to obtain an expert, or otherwise prepare a

State *v.* Hargett

response to the new evidence. This is especially so in
light of the fact that the defendant has presented no
argument, other than general speculation, regarding
how the untimely disclosed evidence altered his theory
of defense, particularly regarding the shooter's identity.
Although we are not holding that two weeks necessarily
constitutes a reasonable continuance in all cases, in
the present case, because the firearms evidence was
not central to the state's case or to the defense, the
defendant has failed to establish that he could not have
received a reasonable continuance without jeopardizing
his statutory right to a speedy trial. As a result, "it [is]
difficult for the defendant to prove that he was denied
a speedy trial." *State* v. *Lacks*, supra, 58 Conn. App.
419.[26] Consequently, the third *Barker* factor does not
weigh in favor of the defendant's claim.

Implicating the second *Barker* factor, the defendant
also argues that a continuance was an inadequate rem-
edy because the state's untimely disclosure was the
result of "an egregious lack of diligence," although he
does not contest the trial court's finding that the state
did not act in bad faith. The defendant argues that the
prosecutor in the present case should have been aware
of this evidence two years before trial because the pros-
ecutor's office was aware of the gun's existence and
the Bridgeport police (also a state actor) possessed
the gun.

We cannot disagree with the defendant that the state's
actions lacked due diligence and that, if the appropriate
state actors had acted with due diligence, the evidence
would have been disclosed sooner. Although the prose-

[26] Given the extraordinary nature of that remedy, we decline the defen-
dant's request to exercise our supervisory authority over the administration
of justice to create a rule requiring either exclusion of evidence or dismissal
of all charges when the state untimely discloses evidence after a defendant
has invoked his right to a speedy trial. See, e.g., *Halladay* v. *Commissioner
of Correction*, 340 Conn. 52, 67 n.9, 262 A.3d 823 (2021).

State *v.* Hargett

cutor in this case clearly was not aware of the evidence, it was the combined actions of several state actors—the police, the prosecutor in this case, and the prosecutor in the unrelated robbery case—that caused the late disclosure.[27] And yet, as is too often the case, any consequences for the late disclosure fell on the defendant, with the state suffering little for its own neglect.

Nevertheless, considering all relevant facts, including the trial court's undisputed finding of a lack of bad faith, the trial court's offer of both a continuance and the continuation of plea bargaining, and the possibility that the defendant could have received a reasonable continuance without hindering his right to a speedy trial, we conclude that the defendant has failed to establish that his right to a speedy trial would have been violated if he had accepted the trial court's offer of a reasonable continuance. The weight of these same factors also shows that exclusion of the evidence or dismissal of the murder charge was not the only appropriate remedy for the state's late disclosure. As a result, we cannot disagree with the Appellate Court that the trial court did not abuse its discretion in declining to exclude the evidence or to dismiss the murder charge.

Our conclusion should not be cause for self-satisfaction on the part of the state, however. In particular, although we conclude that the trial court did not abuse its discretion, the state should note well that the trial

_____

[27] Although the defendant argues that we should impute to the prosecutor in this case the awareness of this evidence by the police for two years, he does not provide any case law or analysis in support of his argument. Thus, we do not consider this argument. Nevertheless, we note that the police and the prosecutor regularly work together in criminal cases. Additionally, in the present case, another prosecutor in the state's attorney's office clearly was aware of this evidence at some point in the unrelated robbery case. It is clear that the combined actions of multiple state actors caused the late disclosure. Regardless of whether the knowledge of the police may be imputed to the prosecutor's office, we caution all state actors that they must be diligent in their disclosure of discoverable materials in criminal cases.

State *v.* Hargett

court also likely would have been well within its discretion to *deny* the admission of the weapon and accompanying reports. This is especially so considering that the state was quite apparently ready to go to trial without the weapon, and the record of what precisely went awry in this case is not clear. For example, we do not know on this record the procedures in place and the technology available to the state and local police that would have enabled them to avoid what took place with the untimely disclosed evidence and to comply with their obligations.

But, we are many years removed from a time when governmental actors, sometimes (but not always) without all the resources of the private sector or some larger governmental entities, are resigned to rely on primitive tickler systems, handwritten notes, or an individual employee's memory to comply with discovery obligations. This cannot have been the only time in recent history when evidence—tangible or written—was relevant or necessary to two prosecutions, even unrelated prosecutions. A particular prosecutor's or staff person's negligence in failing either to ask for or to forward the evidence at issue can simply no longer constitute an acceptable excuse for the state's lack of compliance with its discovery obligations to the defendant's detriment. Prosecuting authorities must plan for the fact that personnel will turn over, memories will fail, and the press of other business will often interfere with the state's obligations unless measures are taken to ensure compliance. Too often, these foreseeable problems result in untimely disclosures, followed by the state's arguing that justice would not be served by enforcing the letter of the rule through the exclusion of evidence. We caution the state that, although in many cases, including this case, a continuance may be an appropriate remedy for the untimely disclosure of evidence, the state has a duty to defendants, to the public, and to the courts to act with diligence in the disclosure of

State *v.* Hargett

evidence. And, as our abuse of discretion standard of review appropriately makes clear, it is the solemn obligation of our trial courts in the first instance to encourage compliance with these obligations and to penalize noncompliance.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.